Albert GONZALES and Mary Gonzales,
Plaintiffs–Appellees,

Deputy Darrell Pierce, Defendant–
Appellee,

v.

NATIONAL BROADCASTING COMPA-
NY, INC., Respondent–Appellant.

Docket No. 97–9454.

United States Court of Appeals,
Second Circuit.

Argued May 7, 1998.

Decided Sept. 22, 1998.

Amended Sept. 29, 1999.

Susan E. Weiner, New York, NY (Dan-
iel M. Kummer, National Broadcasting
Co., Inc., Law Department, of counsel), for
Respondent–Appellant.

Perry R. Sanders, Jr., Lake Charles, LA
(Sanders, Crochet & Chism, LLP, Lake
Charles, LA, Brian D. Caplan, Goodkind,
Labaton, Rudoff, & Scharow, New York,
NY, of counsel), for Plaintiffs–Appellees.

Michael O. Hardison, Snow, Becker, & Krause, New York, NY, Andre J. Buisson, Jennings, LA, of counsel, for Defendant–Appellee.

Laura R. Handman, New York, NY (Matthew S. Schweber, Davis Wright Tremaine LLP, of Counsel), for Amici Curiae, ABC, Inc., Advance Publications, Inc., The Associated Press, Bloomberg, L.P., Cable News Network, Inc., CBS Corp., Daily News, L.P., Dow Jones & Company, Inc., Gannett Cc., Inc., The McGraw–Hill Companies, Inc., Newsday, Inc., The New York Press Club, Inc., The New York Times Company, NYP Holdings, Inc., The Reporters Committee for Freedom of the Press, Reuters America, Inc., Time Inc., and Univision Communications, Inc.

Before: McLAUGHLIN, and LEVAL, Circuit Judges, and SPATT,* District Judge.

LEVAL, Circuit Judge: **

Respondent National Broadcasting Company, Inc. ("NBC") appeals from orders of the United States District Court for the Southern District of New York (Harold Baer, Jr., *Judge* ), one entered September 26, 1997, granting in part motions to compel compliance with non-party subpoenas issued to NBC, *Gonzales v. Pierce*, 175 F.R.D. 57 (S.D.N.Y.1997), and another entered October 29, 1997, holding NBC in contempt for noncompliance with the September order. The subpoenas sought production of certain unedited, unbroadcast videotapes, known as "outtakes," as well as deposition testimony from NBC representatives concerning the events recorded on the videotapes. The subpoenas, issued by the clerk of the United States District Court for the Southern District of

New York, were served on NBC by parties to a civil rights action pending in the United States District Court for the Western District of Louisiana.

Upon the motion to compel compliance, the district court concluded that this circuit has recognized a qualified privilege for nonconfidential information collected by journalists, *Gonzales*, 175 F.R.D. at 59 (citing *In re Petroleum Products Antitrust Litig.*, 680 F.2d 5, 7 (2d Cir.1982)), but that the movants had satisfied the requirements for overcoming the privilege. *Id.* at 59–60. It accordingly directed NBC to produce the outtakes and an affidavit authenticating them. *Id.* at 60–61.

Upon the hearing of this appeal, we affirmed on the ground that no qualified privilege exists for nonconfidential information. NBC moved for rehearing. Having reconsidered our opinion, we agree with the district court that our circuit has previously recognized a qualified privilege for nonconfidential press information, and we now explicitly reaffirm its existence. We also clarify, however, that where nonconfidential information is at stake, the showing needed to overcome the journalists' privilege is less demanding than for material acquired in confidence. As we conclude that the necessary showing has been made in this case, we affirm the orders of the district court.

## I. BACKGROUND

A. *The underlying lawsuit.*

In May, 1996, Albert Gonzales and Mary Gonzales (the "Gonzaleses" or the "Plaintiffs") commenced a civil rights action under 42 U.S.C. § 1983 in the United States District Court for the Western District of Louisiana (the "Louisiana Action"). The

---

* The Honorable Arthur D. Spatt, of the United States District Court for the Eastern District of New York, sitting by designation.

** During consideration of the application for rehearing, Judge Parker, the author of the initial decision of the Court, disqualified himself from this appeal. Before learning of the circumstances that led to his disqualification,

Judge Parker recognized the need for significant revision of the opinion now withdrawn, and expressed views on the disposition of the appeal substantially similar to those stated herein. The writing judge was named by the Chief Judge to replace Judge Parker on the panel.

complaint alleges that defendant Darrell Pierce, a Louisiana Deputy Sheriff ("Deputy Pierce" or the "Defendant"), pulled the Gonzaleses over on Interstate 10 on November 28, 1995, without any probable cause or reasonable suspicion, and detained them by reason of their Hispanic origin. Plaintiffs further allege that it was Deputy Pierce's practice to stop travelers without probable cause or reasonable suspicion in order to extort valuable property from them, and to detain and question "minority citizens, including Hispanics," longer than similarly situated Caucasians. The complaint seeks compensatory and punitive damages as well as injunctive relief.

On January 3, 1997, NBC aired a segment on its "Dateline" television program reporting on what it described as pervasive abuses by law enforcement officers in Louisiana who conduct unwarranted stops of motorists, particularly of out-of-state travelers. According to the report, these stops often lead to harassment and seizure of property. The report included a videotaped stop of one of its employees, Pat Weiland, by Deputy Pierce. Weiland, a Dateline producer and a cameraman, rented a car, equipped it with hidden cameras, and traveled incognito on Louisiana roadways to investigate allegations of malfeasance by Louisiana highway patrolmen. In May, 1996, six months after the Gonzaleses were pulled over, Deputy Pierce stopped Weiland, claiming Weiland had been slowing down and speeding up. The Dateline report asserted that the car had in fact been on cruise control below the posted speed limit. The report also maintained that footage recorded by hidden cameras demonstrated that no traffic laws had been violated, and that the car had been stopped without probable cause. The actual video images broadcast in the report, however, showed only a few brief clips of the car in motion, as well as footage of Deputy Pierce pulling over the vehicle and examining the currency compartment of a passenger's wallet.

In August, 1997, the Gonzaleses served NBC with a subpoena seeking the original, unedited camera footage of Deputy Pierce's stop of Weiland, as well as deposition testimony from NBC representatives about the events recorded on the videotape. Approximately one month later, Deputy Pierce served NBC with a similar subpoena. NBC objected to both subpoenas in part on the grounds that they sought materials protected from disclosure by the qualified privilege for journalists. Both the Plaintiffs and the Defendant filed motions in the Southern District of New York to compel NBC's compliance with their respective subpoenas in September, 1997.

### B. *Prior rulings.*

The district court granted in relevant part the motions to compel NBC's compliance with the subpoenas. *Gonzales,* 175 F.R.D. at 60 (Order of Sept. 26, 1997). The court first noted that the parties had agreed that the scope of any applicable privilege is governed by federal law because the underlying case asserted a federal claim. *Id.* at 59. Quoting from Second Circuit precedent, the court then explained that

"to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: (1) highly material and relevant, (2) necessary or critical to the maintenance of the claim, and (3) not obtainable from other available sources." *United States v. Cutler,* 6 F.3d 67, 71 (2d Cir.1993) (quotations and citations omitted); *In re Petroleum Products Antitrust Litig.,* 680 F.2d 5, 7 (2d Cir.1982).

*Gonzales,* 175 F.R.D. at 59. The district court also posited, citing Second Circuit precedent, that although "[t]he rationale underlying the journalists' privilege—ensuring the free flow of information—supports greater protection for confidential sources, and the development of the re-

porters' privilege has focused on the importance of protecting the identity of confidential sources," the privilege "applies to both confidential and non-confidential sources." *Id.*

The court then held that the three requirements for overcoming the qualified privilege were met in this case: The Gonzaleses had made a showing that the tapes were "highly material and relevant," because their claims against Deputy Pierce alleged a pattern and practice of illegal stops, and each additional instance of proof they could marshal was therefore significant. *Id.* at 59. The Gonzaleses had established that the tapes were "necessary or critical to the maintenance of the[ir] claim," because they were seeking punitive damages and injunctive relief, which they could obtain only by demonstrating a pattern and practice of conduct. *Id.* at 59. Finally, as to the third requirement, the court held that the Gonzaleses had shown that the evidence in the tapes was "not obtainable from other available sources." *Id.* at 60.

The court then found that Deputy Pierce's need for the tapes was equally compelling. *Id.* In main, the court reasoned that if the tapes were to establish that Deputy Pierce had had probable cause to stop the Dateline car, "they would provide unique evidence of both his proper behavior and his veracity." *Id.* The court also opined that the tapes were "critical to [Deputy Pierce's] defense against the punitive damages and injunctive relief claims, especially in light of Sheriff Edwards' stated intentions to terminate Deputy Pierce if the tapes reveal that he acted improperly." *Id.* Finally, the court expressed the view that "compelling production of the tapes is further supported by the fact that no confidential information is at issue here." *Id.*

Accordingly, the district court ordered NBC to comply with the part of the subpoenas requiring production of the outtakes. *Id.* After NBC failed to comply,

the court entered an additional order holding NBC in contempt. NBC appealed. As noted above, on our initial review, we affirmed on the ground that the qualified privilege for press materials does not apply to matter received from nonconfidential sources. On NBC's motion for rehearing, we have reconsidered our disposition.

## II. DISCUSSION

We agree with NBC that the qualified privilege protecting press materials from disclosures applies to nonconfidential as well as to confidential materials. We agree with Plaintiffs, however, that litigants seeking to subpoena nonconfidential press materials need make a less demanding showing than those who seek confidential press resources, and that the parties to the Louisianna Action have made the requisite showing in this dispute.[1]

A. *The nature of the qualified privilege for nonconfidential press materials.*

This circuit has long recognized the existence of a qualified privilege for journalistic information. In *Baker v. F. & F. Inv.,* 470 F.2d 778 (2d Cir.1972), the first case to recognize such a privilege, we affirmed the district court's denial of a motion to compel a reporter to disclose the name of a "blockbuster" whom the reporter had interviewed while preparing an article on housing discrimination. *Id.* at 779–80. The source's identity was sought by plaintiffs in a civil rights action. *Id.* We explained that

> federal law [does not] require disclosure of [journalists'] confidential sources in each and every case, both civil and criminal, in which the issue is raised. Absent a federal statute to provide specific instructions, courts which must attempt to divine the contours of non-statutory federal law governing the compelled disclosure of confidential journalistic sources must rely on both judicial prece-

---

1. Although both Plaintiffs and Deputy Pierce served subpoenas on NBC for the outtakes, only Plaintiffs have filed opposition in this court to NBC's appeal.

dent and well-informed judgment as to the proper federal public policy to be followed in each case.

*Id.* at 781. While our reasoning in *Baker* focused on the importance of protecting journalists' confidential sources, we also grounded the qualified privilege in a broader concern for the potential harm to the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters." *Id.* at 782.

In *McGraw–Hill, Inc. v. Arizona (In re Petroleum Prods. Antitrust Litig.),* 680 F.2d 5 (2d Cir.1982), our next decision to address this area of doctrine, we reaffirmed the existence of the journalists' privilege, vacating a district court's order compelling an editor of a news service to produce a document containing the names of confidential sources sought by certain state governments in an antitrust action. *Id.* at 6–7. In language that has since been characterized as the Second Circuit's "test" for overcoming the journalists' privilege, we explained that

> The law in this Circuit is clear that to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.

*Id.* at 7 (internal citations omitted). Although our reasoning in *Petroleum Products* again focused on the importance of maintaining the confidentiality of press sources, we also invoked other factors. We quoted with approval, for instance,

Justice Department Guidelines discouraging any attempt to subpoena the press to appear before grand juries, and stipulating that "all reasonable attempts should be made to obtain information from non-press sources before there is any consideration of subpoenaing the press." *Id.* at 8 (internal citations omitted).

■ While *Baker* and *Petroleum Products* established the existence of a journalists' privilege for confidential materials, subsequent decisions of this court have repeatedly stated that the privilege also extends to nonconfidential materials, and have enforced the privilege in that context. Thus in *United States v. Burke,* 700 F.2d 70 (2d Cir.1983), a criminal defendant charged with RICO offenses relating to the fixing of basketball games sought Time Inc.'s file on a magazine article co-authored by a government witness in the criminal trial. *Id.* at 76. The district court enforced the journalists' privilege and quashed the subpoena. *Id.* Our court affirmed. *Id.* at 78. It was clear that the privileged materials included (and indeed may have consisted entirely of) information not received by the publisher in confidence, as the "source" of the information was the author of the article.[2] *Id.* at 76.

Similarly, in *United States v. Cutler,* 6 F.3d 67 (2d Cir.1993), an attorney for a defendant in a criminal case, charged with contempt of court after making public statements about the case in violation of the trial judge's order, subpoenaed a TV station's outtakes of his pronouncements. *Id.* at 69–70. The case did not involve confidential materials, as the attorney's pronouncements were made publicly in front of television cameras. *Id.* at 69. We affirmed the district court's ruling that the journalists' privilege was overcome be-

---

**2.** The fact that the district judge in *Burke* examined the materials *in camera* could in theory support the inference that the materials came from a confidential source. We believe that inference is unwarranted. Time sought to bar the disclosure of its materials; had the trial judge inspected them publicly, the mere inspection would have effectively

defeated the purpose of Time's motion asserting the journalists' privilege. District courts in the Second Circuit have correctly understood *Burke* to apply the privilege to nonconfidential information. *See, e.g., United States v. Hendron,* 820 F.Supp. 715, 717–18 (E.D.N.Y. 1993) (Nickerson, *J.*).

cause of the importance of the material to the attorney in making his defense to the contempt charge. *Id.* at 73–74, 75. Although we did not apply the standard for overcoming the privilege elucidated in *Petroleum Products,* it is clear we proceeded on the assumption that, despite the nonconfidential nature of the information sought, a qualified journalists' privilege applied, and the defendant had to show a sufficient need for the information to overcome the privilege. *See id.* at 73, 74 (emphasizing the "clear relevance of the Outtakes to Cutler's defense," and his need to "examine . . . the Outtakes . . . to defend against the charge that his statements were criminally contemptuous").[3]

In *Krase v. Graco Children Prods., Inc.,* 79 F.3d 346 (2d Cir.1996), we again confronted a journalist's claim of privilege for nonconfidential material when a defendant in a products liability lawsuit sought to compel disclosure of certain NBC Dateline outtakes it deemed relevant to its case. *Id.* at 348. We reversed the district court's order denying a motion to quash the defendant's subpoena, and directed instead that the subpoena be quashed. *Id.* at 353. While we enforced the privilege on the basis of New York state law, we expressly noted (citing *Cutler*) that the contours of the privilege under federal law are "identical" to those under the applicable New York statute. *Id.*

Finally, in *von Bulow v. von Bulow,* 811 F.2d 136 (2d Cir.1987), we stated that so long as an entity gathers information with "intent to disseminate to the public," it may avail itself of the journalists' privilege regardless whether "the source [of the information is] confidential or nonconfidential." *Id.* at 142, 143. We explained that "like the compelled disclosure of confidential sources, the compelled production of a reporter's [nonconfidential] materials may substantially undercut the public policy favoring the free flow of information to the public that is the foundation of the privilege." *Id.* at 143 (internal citation, quotation marks, and bracketing omitted). Furthermore, we cited with approval several lower court decisions applying the privilege to nonconfidential press resources. *Id.*

In addition to the instances in which we ourselves have affirmed the existence of a journalists' privilege for nonconfidential information and have enforced that privilege, there have numerous similar instances in the Second Circuit's district courts. For nearly twenty years, the district courts of the Second Circuit have consistently assumed that a journalists' privilege for nonconfidential materials exists, and have enforced it where apposite.[4] This body of

---

**3.** Our opinion in *Cutler* also included language limiting *Burke* to its facts. *Cutler,* 6 F.3d at 73. This language should not be construed to suggest that our *Cutler* opinion challenged the very existence of a journalists' privilege for nonconfidential materials. We understand *Cutler* to limit *Burke* only as to how much of a showing was needed to *overcome* the privilege when the materials at issue were sought by a criminal defendant. The limitation was meant to lower the bar of the showing required of such a defendant to obtain disclosure of reporters' materials; it resulted from our view in *Cutler* that *Burke* undervalued the needs of criminal defendants in putting on a defense. *See Cutler,* 6 F.3d at 73 (distinguishing *Burke* because the materials sought there were "merely cumulative" and not essential to the defendant's case, and concluding that "*Burke* should accordingly be considered as limited to its facts").

**4.** *See, e.g., Gonzales v. Pierce,* 175 F.R.D. 57, 59 (S.D.N.Y.1997); *Pugh v. Avis Rent A Car System, Inc.,* 1997 WL 669876, at *5 (S.D.N.Y.1997); *Application of Waldholz,* 1996 WL 389261, at *2 (S.D.N.Y.1996); *SEC v. Seahawk Deep Ocean Technology, Inc.,* 166 F.R.D. 268, 270 (D.Conn.1996); *Aequitron Med., Inc. v. CBS, Inc.,* 1995 WL 406157, at *2 (S.D.N.Y.1995); *United States v. Hendron,* 820 F.Supp. 715, 717–18 (E.D.N.Y.1993); *Blum v. Schlegel,* 150 F.R.D. 42, 45 (W.D.N.Y. 1993); *In re Pan Am Corp.,* 161 B.R. 577, 582 & n. 4 (S.D.N.Y.1993); *United States v. Sanusi,* 813 F.Supp. 149, 153 (E.D.N.Y.1992); *Lipinski v. Skinner,* 781 F.Supp. 131, 136 (N.D.N.Y.1991); *Sommer v. PMEC Assocs. & Co.,* 1991 WL 73858 at *1–*3 (S.D.N.Y. 1991); *United States v. Marcos,* 1990 WL 74521, at *2–*3 (S.D.N.Y.1990); *Bradosky v. Volkswagen of America, Inc.,* 1988 WL 5433, at *11 (S.D.N.Y.1988); *In re Application of*

precedent deserves mention, as it is in the district courts that most discovery litigation occurs, and appeals from discovery rulings are relatively infrequent.

In the course of the foregoing rulings, our court has not expressed in detail the reasons for applying the journalists' privilege to nonconfidential materials. As earlier mentioned, both *Petroleum Products* and *Baker* focused on the public policy interest in safeguarding the confidentiality of those who convey information to the press. *See Petroleum Products,* 680 F.2d at 7–8; *Baker,* 470 F.2d at 781–83. Indeed, the requirements for overcoming the privilege that we elucidated in *Petroleum Products* were designed "to protect the important interests of reporters and the public in preserving the confidentiality of journalists' sources." 680 F.2d at 7. Yet *Petroleum Products* and *Baker* alike implied that there were also broader concerns undergirding the qualified privilege for journalists—such as the "pivotal function of reporters to collect information for public dissemination," *Petroleum Products,* 680 F.2d at 8, and the "paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters." *Baker,* 470 F.2d at 782.

These broader concerns, we believe, are relevant regardless whether the information sought from the press is confidential. If the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims. The resulting wholesale exposure of press files to litigant scrutiny would burden the press with heavy costs of subpoena compliance, and could otherwise impair its ability to perform its duties—particularly if potential sources were deterred from speaking to the press, or insisted on remaining anonymous, because of the likelihood that they would be sucked into litigation. Incentives would also arise for press entities to clean out files containing potentially valuable information lest they incur substantial costs in the event of future subpoenas. And permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties.[5]

 For these reasons, we reaffirm that the qualified privilege for journalists applies to nonconfidential, as well as to confidential, information.[6] However, it is

---

*Consumers Union,* 495 F.Supp. 582, 586 (S.D.N.Y.1980).

**5.** We are not the only circuit that has taken note of the foregoing concerns; others also have recognized a privilege for nonconfidential press materials. *See, e.g., Shoen v. Shoen,* 48 F.3d 412, 415–16 (9th Cir.1995) (reasoning that "routine court-compelled disclosure of [nonconfidential journalistic] research materials poses a serious threat to the vitality of the newsgathering process," and positing that the absence of a privilege for nonconfidential information would result in numerous adverse effects); *United States v. Cuthbertson,* 630 F.2d 139, 147 (3d Cir.1980) (reasoning that "compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes," and "may substantially undercut the public policy favoring the free flow of

information to the public that is the foundation for the [journalists'] privilege"); *see also United States v. LaRouche Campaign,* 841 F.2d 1176, 1182 (1st Cir.1988) (reasoning that "[w]e discern a lurking and subtle threat to journalists and their employers if disclosure of outtakes, notes, and other unused information, even if nonconfidential, becomes routine and casually, if not cavalierly, compelled," and discussing the nature of this threat at length).

**6.** Previous decisions of our court have expressed differing views on whether the journalists' privilege is constitutionally required, or rooted in federal common law. *Compare Baker,* 470 F.2d at 781 (reasoning that "[a]bsent a federal statute to provide specific instructions, courts which must attempt to divine the contours of non-statutory federal law governing the compelled disclosure of confi-

important to recognize that, where the protection of confidential sources is not involved, the nature of the press interest protected by the privilege is narrower. *Cf. Shoen v. Shoen*, 5 F.3d 1289, 1295–96 (9th Cir.1993) (reasoning that " 'the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case' ") (quoting *United States v. Cuthbertson*, 630 F.2d 139, 147 (3d Cir.1980)). The stringent test we enunciated in *Petroleum Products* for overcoming the qualified privilege was designed "to protect ... the confidentiality of journalists' sources." 680 F.2d at 7. We believe that when protection of confidentiality is not at stake, the privilege should be more easily overcome. Accordingly, we now hold that, while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought. Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources.

B. *Whether the privilege has been overcome in this case.*

■ The district court, applying the *Petroleum Products* test, held that both the Gonzaleses and Deputy Pierce had made a showing sufficient to overcome NBC's assertion of the journalists' privilege with respect to the Dateline outtakes. *Gonzales*, 175 F.R.D. at 59–60. As noted above, because the outtakes were not ma-

terials obtained by NBC in confidence, the *Petroleum Products* test is not applicable. We need only determine whether the parties to the Louisiana Action have established that the outtakes are of likely relevance to a significant issue in the case, and contain information not reasonably obtainable from other available sources. We answer both questions affirmatively.

The outtakes are clearly relevant to a significant issue in the case. The District Court reasonably found they may assist the trier of fact in assessing whether Deputy Pierce had probable cause to stop the NBC vehicle and might help determine whether he engaged in a pattern or practice of stopping vehicles without probable cause, as the Plaintiffs allege. *Gonzales*, 175 F.R.D. at 59. We are also persuaded that the outtakes contain information that is not reasonably obtainable from other available sources, because they can provide unimpeachably objective evidence of Deputy Pierce's conduct. We agree with the district court that in this instance a deposition is not an adequate substitute for the information that may be obtained from the videotapes. *Id.* at 60.

We conclude that (i) NBC's videotapes are protected by a qualified journalists' privilege applicable to nonconfidential press materials; (ii) the privilege applicable to nonconfidential press information is overcome on a showing that the materials sought are of likely relevance to a significant issue in the case and are not reasonably obtainable through other available sources; and (iii) the parties to the Louisiana Action, who subpoenaed the tapes, have satisfied the test to overcome NBC's privilege.

CONCLUSION

The orders of the district court granting the motions to compel production of the

dential journalistic sources must rely on both judicial precedent and well-informed judgment as to the proper federal public policy to be followed in each case") *with von Bulow*, 811 F.2d at 142 (reasoning that "the process of newsgathering is a protected right under

the First Amendment, albeit a qualified one," and that "[t]his qualified right ... results in the journalist's privilege"). Until Congress legislates to modify the privilege or do away with it, however, we need not decide whether the privilege is founded in the Constitution.

outtakes, and holding NBC in contempt, are hereby AFFIRMED.