Michael SCHILLER, et al., Plaintiffs,

v.

The CITY OF NEW YORK,
et al., Defendants.

Hacer Dinler, et al., Plaintiffs,

v.

The City of New York, et al., Defendants.

Nos. 04 Civ. 7922(KMK)(JCF),
04 Civ. 7921(KMK)(JCF).

United States District Court,
S.D. New York.

May 23, 2007.

---

*MEMORANDUM AND ORDER*

JAMES C. FRANCIS IV, United States Magistrate Judge.

These are two of many cases concerning the arrests of protestors during the Republican National Convention (the "RNC") in New York City in 2004. Following the RNC, the New York Civil Liberties Union (the "NYCLU") disseminated a questionnaire seeking information about alleged police misconduct during demonstrations that accompanied the convention. After about 80 lawsuits were filed, including these two cases in which the plaintiffs are represented by the NYCLU, the City of New York and the individual defendants (collectively, the "City") subpoenaed documents from the NYCLU, including the completed questionnaires. While the NYCLU produced some documents, it declined to disclose the questionnaires, contending that they are immune

from discovery on the basis of the attorney-client privilege and the First Amendment. Accordingly, the City has now moved pursuant to Rule 45(c)(2)(B) of the Federal Rules of Civil Procedure for an order enforcing the subpoena and requiring the NYCLU to disclose the documents at issue. For the reasons that follow, the City's motion is granted.

*Background*

The NYCLU is an affiliate of the American Civil Liberties Union. (Declaration of Donna Lieberman dated Feb. 22, 2007 ("Lieberman Decl."), ¶ 2). It is a not-for-profit organization dedicated to defending the constitutional rights of individuals. (Lieberman Decl., ¶ 2). To further this mission, the NYCLU engages in different modes of advocacy, including litigation, lobbying of government agencies, and publication of investigative reports on government practices that may pose a threat to civil liberties. (Lieberman Decl., ¶¶ 3, 4). The NYCLU has on several occasions challenged policies of the City and of the New York City Police Department (the "NYPD") concerning the treatment of protestors at demonstrations. *See, e.g., United for Peace and Justice v. City of New York*, 323 F.3d 175 (2d Cir.2003); *Stauber v. City of New York*, Nos. 03 Civ. 9162, 03 Civ. 9163, and 03 Civ. 9164, 2004 WL 1593870 (S.D.N.Y. July 16, 2004).

In advance of the RNC, the NYCLU lobbied the NYPD, hoping to convince it to adopt certain practices in connection with the demonstrations that were anticipated. (Lieberman Decl., ¶ 9). It later represented groups seeking permits to demonstrate and distributed handbooks instructing protestors what to do in the event they were arrested. (Lieberman Decl., ¶¶ 10, 11). The NYCLU also determined that it would issue a report addressing police practices and interactions with demonstrators during the convention. (Lieberman Decl., ¶ 12). When the RNC began, the NYCLU used observers to monitor police conduct. (Lieberman Decl., ¶ 14). As it began receiving complaints, the NYCLU routed them to an attorney who reviewed them to determine the appropriate response. (Lieberman Decl., ¶ 15). In some instances, the NYCLU referred persons who had been arrested to the National Lawyers Guild for individual representation, and in other cases it approached government officials directly, seeking relief on behalf of groups of protestors. (Lieberman Decl., ¶ 16). Ultimately, the NYCLU instituted these two cases.

On September 3, 2004, the NYCLU transmitted a questionnaire through an e-mail list that it maintains. (Lieberman Decl., ¶ 17). It also made the form available on its website and at its offices. (Lieberman Decl., ¶ 17). This questionnaire was entitled "NYCLU Pier 57 Intake Form," and it provided space for the respondent to provide pedigree information; a description of any interaction with police personnel; information about use of force, questioning, or searches conducted by the police; a description of the conditions at Pier 57 where arrestees were processed and detained; the nature of any criminal charges; and an indication whether the respondent had been issued a desk appearance ticket. (Letter of Curt P. Beck dated Jan. 26, 2007 ("Beck 1/26/07 Letter"), Exh. A). The introduction to the forms states, "[t]he information you provide will help the NYCLU and other legal organizations document the policies and practices of the NYPD that interfere with lawful protest, so that we can effectively advocate for change." (Beck 1/26/07 Letter, Exh. A). Furthermore, it directs the respondent to "indicate whether you wish your report to be kept confidential." (Beck 1/26/07 Letter, Exh. A). According to the NYCLU, the questionnaire served a dual purpose: to assist in the determination whether to institute litigation and to provide information for a report on police conduct at the RNC. (Lieberman Decl., ¶ 17). In all, the NYCLU received more than 260 responses. (Declaration of Palyn Hung dated Feb. 22, 2007 ("Hung Decl."), ¶ 13; Lieberman Decl., ¶ 18). "As a result of the accounts it received following the [c]onvention," the NYCLU filed this litigation. (Lieberman Decl., ¶ 20). In addition, it issued a report entitled "Rights and Wrongs at the RNC," which describes interactions between the police and protestors during the convention and makes recommendations for changes in tactics used by the NYPD at mass demonstrations. (Lieberman Decl., ¶ 21 & Exh. 6). The report contains a statistical summary of the complaints re-

ceived as well as unattributed excerpts from the questionnaires. (Lieberman Decl., ¶ 21 & Exh. 6). The NYCLU indicates that it received permission from the person surveyed before quoting a questionnaire answer directly. (Lieberman Decl., ¶ 21). It disseminated the report to public officials, NYCLU supporters, and the news media. (Lieberman Decl., ¶ 22).

On November 8, 2006, the City served a subpoena on the NYCLU, seeking a variety of documents including the questionnaires. (Beck 1/26/07 Letter, Exh. B; Hung Decl., ¶ 14). The NYCLU submitted a response on November 17, 2006, produced certain responsive documents, and identified relevant photographs and videotapes. (Hung Decl., ¶ 15). On December 11, 2006, it provided a privilege log asserting the attorney-client privilege with respect to each of the questionnaires. (Beck 1/26/07 Letter, Exh. C; Hung Decl., ¶¶ 16–27). On December 21, 2006, outside counsel for the NYCLU sent a letter to counsel for the City contending that the questionnaires were also protected from discovery by a First Amendment privilege. (Letter of Helene M. Freeman dated Dec. 21, 2006 ("Freeman 12/21/06 Letter"), attached as Exh. 1 to Declaration of Helene M. Freeman dated Feb. 22, 2007, at 2). Thereafter, the City filed the current motion.

*Discussion*

### A. *Attorney–Client Privilege*

Rule 501 of the Federal Rules of Evidence provides:

> Except as otherwise required by the Constitution of the United States or provided by Act of Congress or in rules prescribed by the Supreme Court pursuant to statutory authority, the privilege of a witness ... shall be governed by the principles of the common law as they may be interpreted by the courts of the United States in the light of reason and experience. However, in civil actions and proceedings, with respect to an element of a claim or defense as to which State law supplies the rule of decision, the privilege of a witness ... shall be determined in accordance with State law.

Accordingly, where federal law provides the rules of decision applicable to the substantive

claims, issues of privilege are governed by the federal common law. *See von Bulow by Auersperg v. von Bulow,* 811 F.2d 136, 141 (2d Cir.1987) ("*von Bulow I*"); *Bondi v. Grant Thornton International,* No. 04 Civ. 9771, 2006 WL 1817313, at *2 (S.D.N.Y. June 30, 2006); *Haus v. City of New York,* No. 03 Civ. 4915, 2006 WL 1148680, at *2 (S.D.N.Y. April 24, 2006). That is the case here.

The traditional articulation of the attorney-client privilege is that:

> (1) where legal advice of any kind is sought (2) from a professional legal advisor in his capacity as such, (3) the communications relating to that purpose, (4) made in confidence (5) by the client, (6) are at his instance permanently protected (7) from disclosure by himself or by the legal advisor, (8) except the protection be waived.

*United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL–CIO,* 119 F.3d 210, 214 (2d Cir.1997) (quotation marks and citation omitted); *see also Kingsway Financial Services, Inc. v. Pricewaterhouse–Coopers LLP,* No. 03 Civ. 5560, 2007 WL 473726, at *7 (S.D.N.Y. Feb.14, 2007); *In re Rivastigmine Patent Litigation,* 237 F.R.D. 69, 73–74 (S.D.N.Y.2006); *Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.,* 160 F.R.D. 437, 441 (S.D.N.Y.1995). The test is sometimes truncated to three elements such that the party invoking the privilege must show "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *In re County of Erie,* 473 F.3d 413, 419 (2d Cir.2007) (citing *United States v. Construction Products Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996)). In any event, "[t]he burden of establishing the existence of an attorney-client privilege, in all of its elements, rests with the party asserting it." *International Brotherhood of Teamsters,* 119 F.3d at 214; *see also In re Grand Jury Subpoenas Dated March 19, 2002 and August 2, 2002,* 318 F.3d 379, 384 (2d Cir. 2003).

■ Here, the NYCLU's assertion of privilege founders on the very first element: the existence of an attorney-client relation-

ship. To be sure, such a relationship may exist without a formal retainer agreement and without legal services ever actually being provided. A prospective client must be able to share confidences with a lawyer in order for a determination to be made whether representation will be offered. Thus, "[m]ost courts have acknowledged, as a general matter, that an attorney-client relationship exists if 'the party divulging confidences and secrets to an attorney believes that he is approaching the attorney in a professional capacity with the intent to secure legal advice.'" *First Hawaiian Bank v. Russell & Volkening, Inc.*, 861 F.Supp. 233, 238 (S.D.N.Y.1994) (quoting *Bennett Silvershein Associates v. Furman*, 776 F.Supp. 800, 803 (S.D.N.Y.1991)).

■ In this case, the NYCLU has offered no evidence that any person who completed a questionnaire believed at that time that he or she was seeking representation by the NYCLU; moreover, any such belief would have been unreasonable.[1] The form says nothing about the provision of legal services. Instead, it solicits information so that the NYCLU "can effectively advocate for change." (Beck 1/26/07 Letter, Exh. A). Furthermore, the questionnaire was not presumed to be confidential, as would be the case if it was created in connection with the establishment of an attorney-client relationship. To the contrary, it suggested that the information provided would be used to help "other legal organizations" advocate for change and that the information would be kept confidential only if the survey respondent affirmatively requested it. (Beck 1/26/07 Letter, Exh. A).

An attorney-client relationship may be established in connection with the use of a questionnaire distributed to multiple potential clients. However, in each case where courts have found questionnaires to be privileged, there were far more compelling indicia of the clients' understanding that an attorney-client relationship was anticipated than is the case here.

For example, in *Gates v. Rohm & Haas Co.*, Civ. A. No. 06–1743, 2006 WL 3420591 (E.D.Pa. Nov. 22, 2006), the court addressed this issue in the context of questionnaires distributed to potential members of a plaintiff class. It stated that "[w]here courts have specifically addressed the discoverability of questionnaires completed by putative class members, the dispositive factor typically is whether the putative class members were seeking legal advice or representation at the time they filled out the questionnaires." *Id.* at *3. The court concluded that the questionnaires at issue there were privileged, observing that:

(1) the attorneys organized the ... meeting [at which the questionnaires were distributed]; (2) persons not seeking legal advice or representation were allegedly directed to leave the meeting before the questionnaires were distributed and the attorneys reportedly directed only those seeking legal advice or representation to fill out the questionnaires; (3) the individuals who completed the questionnaires received them directly from and returned them to an attorney; (4) a lawsuit had already been filed at the time the questionnaires were distributed; and (5) the questionnaires have been kept confidential.

*Id.* at *5.

In a similar vein, the court in *Barton* found "nothing anomalous about applying the privilege to [ ] preliminary consultations" that consisted of distributing a questionnaire to persons who had been exposed to an allegedly dangerous medication. 410 F.3d at 1111. Although the questionnaire protected counsel from potential malpractice claims by stating that no attorney-client relationship was being formed, its purpose was to gather "information about potential class members," which the court found to be a suggestion that counsel were "trolling for clients." *Id.* at 1107. Likewise, in *Bauman v. Jacobs Suchard, Inc.*, 136 F.R.D. 460 (N.D.Ill.1990), the court upheld a claim of privilege for responses to a letter and questionnaire sent by the Equal

---

1. The NYCLU contends that it "treated all these complaints as attorney-client communications, consistent with its routine practice of handling communications it receives that may be construed as requests for legal assistance or advice[.]" (Lieberman Decl., ¶ 19). But, "[m]ore important than what the clients thought is what the law firm intended." *Barton v. United States District Court for the Central District of California,* 410 F.3d 1104, 1107 (9th Cir.2005).

Employment Opportunity Commission (the "EEOC") to employees of a company that it was litigating against. The court stated: "[m]ost importantly, the primary purpose of the letter was to ask the claimants if they desired to be represented by the EEOC. Only those who desired to be represented were asked to complete the questionnaire. The communication was one between a legal representative and *de facto* clients." *Id.* at 463. In *Connelly v. Dun & Bradstreet*, 96 F.R.D. 339 (D.Mass.1982), the court found that the privilege applied to information gathered from customers by an attorney appointed to protect their legal interests in a bankruptcy proceeding. The court found that it could be inferred that "the customers reasonably regarded the Customers' Representative as their lawyer .…" *Id.* at 342.

Most analogous to the cases at hand is *Vodak v. City of Chicago*, No. 03 C 2463, 2004 WL 783051 (N.D.Ill. Jan.16, 2004), a case involving the mass arrest of demonstrators during an anti-war rally. There the court concluded that questionnaires provided to arrestees by the National Lawyers Guild were privileged. It noted that "the professional relationship for purposes of the privilege for attorney-client communications hinges upon the client's belief that he is consulting a lawyer in that capacity and his manifested intention to seek professional legal advice." *Id.* at *2 (quotation marks, citation, and alteration omitted). In concluding that the demonstrators had a reasonable belief that they were engaged in attorney-client communications, the court found that (1) the questionnaire was distributed at a meeting, the purpose of which was to "provide legal information and legal representation if desired, to those people who were arrested or detained," *id.* at *1; (2) "only those who were seeking legal representation or specific advice were requested to complete the form questionnaire," *id.*; (3) "the completed forms were immediately utilized to provide legal representation in criminal court for the arrestees," *id.*; and (4) "the information contained on completed questionnaires was kept confidential and provided only to lawyers who represented the individuals in court." *Id.*

The instant litigation stands in sharp contrast to those cases in which courts have found completed questionnaires to be subject to the attorney-client privilege. The NYCLU did not suggest that it intended to institute class litigation in connection with the RNC; it had filed no lawsuits at the time it distributed its complaint forms; it made no effort to restrict dissemination of the forms to persons seeking legal advice; and the form did not indicate that responses would be considered confidential attorney-client communications. Under these circumstances, it cannot be inferred that persons who filled out the questionnaire reasonably believed that they were seeking legal advice or representation, and the NYCLU has not provided affidavits from any arrestees suggesting that they considered themselves to be clients or potential clients. *See Morisky v. Public Service Electric & Gas Co.*, 191 F.R.D. 419, 421–24 (D.N.J.2000) (questionnaires not privileged where class not yet certified, counsel had no contact with employees of defendant prior to distributing forms, and "there is nothing to indicate that these employees were seeking to become clients at the time they completed the questionnaires"). The NYCLU, then, has failed to demonstrate that the persons who completed the questionnaires in this case were its actual or prospective clients.

Furthermore, not all communications that take place within an attorney-client relationship are privileged. Thus, even if the arrestees had been seeking legal advice, the questionnaires would only be privileged if they contained information conveyed to counsel in confidence. Yet, because the forms directed the persons surveyed to indicate if they wanted their answers to be confidential, the implication was that, in the absence of such a designation, the information would not be held in confidence. Moreover, the NYCLU has not identified any individual questionnaire in which the respondent did request confidentiality.

Thus, the NYCLU has not met its burden of demonstrating that the questionnaires are protected by the attorney-client privilege because it has not shown either that the persons surveyed qualified as clients or pro-

spective clients or that the information they provided was conveyed in confidence.

### B. *First Amendment Privilege*

In the alternative, the NYCLU argues that the questionnaires are immune from discovery on the basis of the First Amendment privilege for investigatory reporting, often denominated the journalist's privilege. As a threshold matter, the City contends that any such privilege has been waived because the NYCLU failed to raise it either in its initial discovery response dated November 17, 2006, or in its privilege log dated December 11, 2006. Letter of Curt P. Beck dated March 20, 2007 ("Beck 3/20/07 Letter") at 8–9. Counsel for the NYCLU first asserted this privilege in a letter to counsel for the City on December 21, 2006. (Freeman 12/21/06 Letter).

It is clear that delay in assertion of a privilege may result in its forfeiture. *See Hurst v. F.W. Woolworth Co.*, No. 95 Civ. 6584, 1997 WL 61051, at *5–6 (S.D.N.Y. Feb.11, 1997); *AFP Imaging Corp. v. Philips Medizin Systems*, No. 92 Civ. 6211, 1993 WL 541194, at *3 (S.D.N.Y. Dec.28, 1993). Whether this sanction is warranted depends on such factors as the length of the delay, the willfulness of the transgression, and the harm to other parties. *See AFP*, 1993 WL 541194, at *3. Here, each of these factors militates against sanctioning the NYCLU by deeming the privilege forfeited. Counsel asserted this additional privilege a mere ten days after the NYCLU produced its privilege log. *Compare Hurst*, 1997 WL 61051, at *4–6 (eight-month delay in producing privilege log results in waiver of privileges) *with Cotto v. Clark Investigations & Services, Ltd.*, No. 03 Civ. 2878, 2003 WL 22358797, at *1 (S.D.N.Y. Oct. 16, 2003) (no waiver despite three-month delay in proffering log). Furthermore, there is no evidence of bad faith, and the City has suffered no prejudice since the NYCLU raised the First Amendment claim well before the City filed its motion to enforce its subpoena. Accordingly, I will address this issue on the merits.

The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information." *Gonzales v. National Broadcasting Co.*, 194 F.3d 29, 32 (2d Cir.1999). There is some dispute whether that privilege is a creature of federal common law or is required by the First Amendment. *See id.* at 35 n. 6; *Mandal v. City of New York*, No. 02 Civ. 1234, 2004 WL 2375817, at *3 (S.D.N.Y. Oct.21, 2004). In either event, it arises from a "concern for the potential harm to the 'paramount public interest in the maintenance of a vigorous, aggressive and independent press capable of participating in robust, unfettered debate over controversial matters.' " *Gonzales*, 194 F.3d at 33 (quoting *Baker v. F & F Investment*, 470 F.2d 778, 782 (2d Cir.1972)). The Second Circuit set the parameters of the privilege in *In re Petroleum Products Antitrust Litigation*, 680 F.2d 5, 7 (2d Cir.1982):

> [T]o protect the important interest of reporters in preserving the confidentiality of journalists' sources, disclosure may be ordered only upon a clear and specific showing that the information is: highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources.

Since that time, the Circuit has expanded the privilege in two ways central to the NYCLU's claim. First, "an individual successfully may assert the journalist's privilege if he is involved in activities traditionally associated with the gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press." *von Bulow I*, 811 F.2d at 142. The court reasoned that

> the protection from disclosure may be sought by one not traditionally associated with the institutionalized press because "[t]he informative function asserted by representatives of the organized press ... is also performed by lecturers, political pollsters, novelists, academic researchers, and dramatists." *Branzburg v. Hayes*, [408 U.S. 665, 705, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972) ]. "It is beyond peradventure that [l]iberty of the press is a right of the lonely pamphleteer who uses carbon paper or the mimeograph just as much as of the large metropolitan publisher who

utilizes the latest photocomposition methods." *Id.* at 704, 92 S.Ct. 2646.

*Id.* at 144–45; *see also Lovell v. City of Griffin, Georgia,* 303 U.S. 444, 452, 58 S.Ct. 666, 82 L.Ed. 949 (1938) ("The press ... comprehends every sort of publication which affords a vehicle of information and opinion."); William E. Lee, *The Priestly Class: Reflections on a Journalist's Privilege,* 23 Cardozo Arts & Ent. L.J. 635, 670–73 (2006) (discussing scope of journalist's privilege). "[W]hether a person is a journalist, and thus protected by the privilege, must be determined by the person's intent at the inception of the information-gathering process." *von Bulow I,* 811 F.2d at 142.

■■■ Second, the protection is no longer limited to confidential information. In *von Bulow I,* the Second Circuit declared that "the relationship between the journalist and his source may be confidential or nonconfidential for purposes of the privilege." 811 F.2d at 143. *But see* Christopher J. Clark, *The Recognition of a Qualified Privilege for Non–Confidential Journalistic Materials: Good Intentions, Bad Law,* 65 Brook. L.Rev. 369, 376 (1999) (arguing that reference to nonconfidential materials in *von Bulow I* was dictum). In *Gonzales,* the court reaffirmed that "the qualified privilege for journalists applies to nonconfidential, as well as to confidential, information." 194 F.3d at 35. However, it also made clear that "when protection of confidentiality is not at stake, the privilege should be more easily overcome." *Id.* at 36. Accordingly,

> while nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought. Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalists' privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources.

*Id.*

These principles can now be applied to the facts of this case. The City argues that the NYCLU "is not a 'journalistic enterprise' and is not 'in the business of providing news' or any factual materials worthy of First Amendment protection." (Beck 3/20/07 Letter at 10). Somewhat ungraciously, the City characterizes the NYCLU reports as "vanity publications" that only "advance its own political agenda and goals." (Beck 3/20/07 Letter at 10). The City concludes that "[n]o one has been known to read a[n] NYCLU publication in order to obtain an *unbiased* rendering of the facts." (Beck 3/20/07 Letter at 10).

■■■ To be sure, "[r]ecognizing that journalists are not always engaged in journalism, ... cases have withheld the journalist's privilege from traditional reporters who were not engaged in what the court considered to be the traditional journalism function, but instead were engaged in lobbying or political activism." Linda L. Berger, *Shielding the Unmedia: Using the Process of Journalism to Protect the Journalist's Privilege in an Infinite Universe of Publication,* 39 Hous. L.Rev. 1371, 1395–96 (2003). But the touchstone is not, as the City suggests, whether the journalistic enterprise was "unbiased"; by that standard, few, if any, daily newspapers could assert the privilege. Rather, the test is whether the enterprise intended to express its views publicly, or merely to engage in private lobbying. *See Anti–Defamation League of B'nai B'rith v. Superior Court,* 67 Cal.App.4th 1072, 1092–94, 79 Cal.Rptr.2d 597, 609–10 (1st Dist.1998) (information gathered for purposes of private lobbying of foreign government not protected under California shield law). Here, the NYCLU has demonstrated that it disseminated the questionnaires with the intent of using the information collected, at least in part, to publish a report that would be widely and publicly circulated. The NYCLU therefore qualifies in this instance as a journalistic enterprise for purposes of the privilege.

■■■ However, as discussed above in connection with the attorney-client privilege, the NYCLU has failed to establish that the information it received was conveyed in confidence. Since the questionnaire instructed respondents to make an affirmative notation

in the event that they wished their responses to be kept confidential, it can fairly be inferred that everyone who made no such notation understood that the information could be made public. Moreover, the NYCLU has not identified a single instance in which a respondent requested confidentiality, nor has it proffered affidavits from protestors attesting that they believed that their communications were confidential.[2] At best, the NYCLU can assert the journalist's privilege for nonconfidential information.

 The City, then, can overcome the privilege by demonstrating that "the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36. It has met this standard. The questionnaire solicited information about at least two sets of issues central to the RNC litigation: alleged patterns of police misconduct and the conditions at Pier 57 where arrestees were detained. Equivalent information could be obtained only by subpoenaing and deposing the hundreds of nonparty witnesses who filled out the questionnaires.[3] Even then, their testimony would likely be less trustworthy given the lapse of time since the convention. Finally, although there may well be documents that touch on some of the same issues as the questionnaires, such documents are a poor substitute for the contemporaneous statements of eyewitnesses.

The NYCLU may also have forfeited the journalist's privilege by using information gleaned from the questionnaires during the course of this litigation. The "fairness doctrine" "prevent[s] prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." *von Bulow by Auersperg v. von Bulow*, 828 F.2d 94, 101 (2d Cir.1987) (*"von Bulow II"*). Under the fairness doctrine, a party that discloses some privileged information cannot thereafter rely on the privilege to withhold related information necessary to gain a complete picture of the facts. *See American Steamship Owners Mutual Protection and Indemnity Association, Inc. v. Alcoa Steamship Co.*, 232 F.R.D. 191, 199 (S.D.N.Y.2005). Since the court in *von Bulow II* found the fairness doctrine applicable to the normally inviolate attorney-client privilege, that doctrine necessarily applies to the qualified journalist's privilege as well. However, "this rule protecting the party, the factfinder, and the judicial process from selectively disclosed and potentially misleading evidence does not come into play when ... the privilege-holder or his attorney has made extrajudicial disclosures, and those disclosures have not subsequently been placed at issue during litigation." *von Bulow II*, 828 F.2d at 102. While it is clear that the NYCLU incorporated information from the questionnaires in its extrajudicial report, the extent to which it injected such information into the RNC litigation remains unclear. Nevertheless, it is unnecessary to develop the record further at this time in order to determine the applicability of the fairness doctrine since the privilege has, in any event, been overcome.

*Conclusion*

The information obtained by the NYCLU through questionnaires distributed to RNC protestors is not immune from discovery by virtue of either the attorney-client privilege or the journalist's privilege. The City's motion to compel production of the information is therefore granted, and the NYCLU shall produce forthwith the information identified in the City's subpoena.

SO ORDERED.

---

**2.** Again, the fact that the NYCLU may have treated the information as confidential is not determinative. In the context of the journalist's privilege, confidentiality is important because a journalist who cannot guarantee confidentiality to his or her sources will be less able to gather news. *See Baker*, 470 F.2d at 782 ("Compelled disclosure of confidential sources unquestionably threatens a journalist's ability to secure information that is made available to him only on a confidential basis[.]"). However, where the source has no expectation of confidentiality, this consideration does not come into play.

**3.** Of course, the NYCLU would first have to disclose the identities of persons who completed the questionnaires.