Claire **LEBOWITZ** and Keegan **Stephan, Plaintiffs,**

v.

The **CITY OF NEW YORK,** NYPD Patrol Officer **Adrianne Edwards,** and NYPD Officer **Does 1–10, Defendants.**

No. 12 Civ. 8982(JSR).

United States District Court, S.D. New York.

June 11, 2013.

---

Paul Lance Mills, Law Office of Paul L. Mills, New York, NY, for Plaintiffs.

Andrew Joseph Lucas, NYC Law Department, Office of the Corporation Counsel, Dara Lynn Weiss, City of New York Law Department, New York, NY, for Defendants.

### MEMORANDUM ORDER

JED S. RAKOFF, District Judge.

Plaintiffs Claire Lebowitz and Keegan Stephan bring this action under 42 U.S.C. § 1983 against the City of New York, NYPD Patrol Officer Adrianne Edwards, and NYPD Officer Does 1–10 (collectively, the "City"), asserting claims related to plaintiffs' arrest in Zuccotti Park on January 10, 2012, and their treatment immediately thereafter. The City has served a testimonial subpoena on nonparty Colin Moynihan, a freelance journalist for the New York Times, regarding an article he wrote about the events at Zuccotti Park on the date in question. In particular, the City seeks to depose Moynihan about whether, as reported in his article, plaintiffs were warned that they could not lie down in the park before they were arrested. Moynihan now moves to quash the subpoena on the ground that the information sought is protected by the reporter's privilege. For the reasons that follow, that motion is granted.

The facts pertinent to this motion are not in dispute. According to the allegations in the plaintiffs' amended complaint, on January 10, 2012 plaintiffs were participating in a peaceful gathering in and around Zuccotti Park. Am. Compl. ¶¶ 3–4, 54. Barricades blocking access to the park had been removed earlier that day as a result of a court victory obtained by parties associated with the Occupy Wall Street movement, which had first arisen in Zuccotti Park the previous fall. *Id.* ¶¶ 4, 54. Late in the evening, after the crowds had dispersed, plaintiffs were lying down on a bench in the park, and were then arrested for violating park rules. *Id.* ¶¶ 7–9, 25, 55–57. Plaintiffs allege that before they were arrested, they never heard or received a warning that they were not permitted to lie down in the park. *Id.* ¶¶ 14, 59.

Mr. Moynihan has extensively covered the Occupy Wall Street movement, and was present at Zuccotti Park on the day in question. Decl. of Colin Moynihan ("Moynihan Decl."), ¶¶ 3–4. The next day, January 11, 2012, Moynihan published a blog post (the "Article") entitled "Barricades Come Down at Zuccotti Park" on the New

York Times's "City Room" blog. *Id.*, ex. A. Insofar as relevant here, the Article states that "[a]t about 2 a.m., a security guard told a man and a woman lying on a granite bench there to get up. They did not immediately rise. Moments later both were arrested and led away." *Id.* It appears likely that the man and woman described in the article are in fact the plaintiffs, and the City now seeks to compel Moynihan to testify to confirm that plaintiffs were given a warning before they were arrested.

■ In the interest of protecting a vibrant free press from unwarranted intrusion, courts have held that journalists possess a qualified privilege shielding certain information obtained in the newsgathering process from discovery by litigants. As the Second Circuit has explained, "[i]f the parties to any lawsuit were free to subpoena the press at will, it would likely become standard operating procedure for those litigating against an entity that had been the subject of press attention to sift through press files in search of information supporting their claims." *Gonzales v. National Broadcasting Company*, 194 F.3d 29, 35 (2d Cir.1999). In addition, "permitting litigants unrestricted, court-enforced access to journalistic resources would risk the symbolic harm of making journalists appear to be an investigative arm of the judicial system, the government, or private parties." *Id.* These concerns, moreover, "are relevant regardless whether the information sought from the press is confidential." *Id.*

Nevertheless, the City contends, as a threshold matter, that the reporter's privilege does not apply to a reporter's direct testimony about his or her firsthand observations. The City notes that the court in *Gonzales* spoke of a privilege for "press materials," 194 F.3d at 36, and contends that that language should be understood to limit the privilege to items such as interview notes, outtakes from filmed interviews, unpublished photographs, the identities of sources, and the like. The City also cites two district court cases stating that "[a] reporter's observations of a public place or event are no different than that of other individuals; and as to this, they are not entitled to constitutional protection." *United States v. Markiewicz*, 732 F.Supp. 316, 319 (N.D.N.Y.1990) (quoting *Alexander v. Chicago Park Dist.*, 548 F.Supp. 277, 278 (N.D.Ill.1982)).[1]

In contrast to these cases, however, most courts have found this argument unpersuasive. Indeed, numerous courts, including this Court and the Second Circuit, have applied the reporter's privilege to direct testimony without the slightest expression of doubt. *See, e.g., United States v. Treacy*, 603 F.Supp.2d 670, 672 (S.D.N.Y.2009) (applying the privilege to direct testimony but finding it overcome under the circumstances), *aff'd in relevant part*, 639 F.3d 32, 36 (2d Cir.2011); *Carter v. City of New York*, No. 02 Civ. 8755(RJH), 2004 WL 193142, at *1 (S.D.N.Y. Feb. 2, 2004) ("This court reads *Gonzales* as establishing a qualified privilege as to all information gathered by a reporter whether through electronic recordation, such as a videotape, or through direct perception."). More fundamentally, the City's proffered distinction makes no sense. Under the City's view, Moynihan's observations would be protected to the extent they were videotaped, photographed, or memorialized in writing, but not if simply remembered in his brain. The Court sees no reason that the policy

---

1. Notwithstanding the reference to "constitutional protection," the Second Circuit has declined to decide whether the reporter's privilege derives from the Constitution or from federal common law. *Gonzales*, 194 F.3d at 36 n. 8.

concerns animating the reporter's privilege would apply any less strongly to compelled testimony than to other types of evidence. Indeed, the City's view would permit any litigant to circumvent the reporter's privilege simply by seeking his or her mental recollections of events, rather than "materials" memorializing those same events. If anything, this would intensify the intrusion on the reporter's role that the reporter's privilege seeks to protect.

Nor does it make any difference that Moynihan was reporting on his own personal observations rather than observations of others. In *Gonzales*, the Second Circuit explained that an entity "may avail itself of the journalists' privilege" "so long as [the] entity gathers information with intent to disseminate to the public.'" *Gonzales*, 194 F.3d at 34 (internal quotation marks omitted). That statement derives from the Second Circuit's earlier decision in *von Bulow by Auersperg v. von Bulow*, 811 F.2d 136, 143 (2d Cir.1987), in which the court explained that "the critical question in determining if a person falls within the class of persons protected by the journalist's privilege is whether the person, at the inception of the investigatory process, had the intent to disseminate to the public the information obtained through the investigation." *Id.*

These decisions give no indication of any exception for information obtained from firsthand observation. Rather, these cases make plain that the reporter's privilege stems from a desire to protect journalists from being regularly subpoenaed, and thus from being transformed, in effect, into the investigative agents of courts and litigants. That rationale applies with equal force to information gleaned from personal observations as to information obtained from interviews or other newsgathering activities. Indeed, exempting firsthand observations from the scope of the reporter's privilege would severely chill journalists from engaging in valuable firsthand reporting, such as that performed by Moynihan here. Accordingly, the reporter's privilege applies to the testimony from Moynihan that the City seeks to obtain.

■ This leads, however, to the issue of whether, on the facts of this case, the privilege has been overcome. In situations like that presented here, the Second Circuit has held that the reporter's privilege may be overcome if the party seeking the information "can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources." *Gonzales*, 194 F.3d at 36. Here, at a minimum, the City has failed to show that the information sought is not reasonably obtainable from other available sources. The City concedes that, even though at least three other witnesses identified by the plaintiff in discovery may have observed the events in question, the City has not subpoenaed them. It argues that, even if it were to obtain the information it seeks from those witnesses, they were closely associated with plaintiffs, and thus "lack objectivity." Likewise, the argument goes, testimony from police officers and security guards who were present at the time will be similarly tainted by their associations with the defense.

But merely because a party believes that a journalist is a disinterested witness does not render other witnesses "unavailable," for if that were the case, the privilege would quickly become a nullity. The hidden assumption in the City's argument—that testimony from an interested witness, whether an associate of the plaintiffs or an employee of the City, is wholly unworthy of belief—is contradicted daily in courts throughout the land. Nor, for that matter, is a reporter necessarily any less biased than those other partial witnesses,

as any review of many television news programs easily demonstrates. The simple fact is that the City, having failed almost completely to pursue the testimony of numerous non-reporter witnesses to the events that Moynihan witnessed, can hardly bootstrap that failure into an argument for breaking the reporter's privilege.

Moreover, even if credibility concerns could theoretically render non-journalist witnesses "unavailable" in an extreme case, they certainly cannot do so here. After the City served its subpoena, it had the opportunity to depose the plaintiffs, one of whom stated that he was unaware of any warnings by police or security guards, but the other of whom admitted that the plaintiffs had in fact received a warning. Thus, the City now has the evidence it seeks from one of the plaintiffs, who, having made an admission against interest, in all likelihood will be an even more powerful witness on this point than Moynihan would be. Under these circumstances, the information the City seeks from Moynihan is available from—and indeed has already been obtained from—a suitable alternate source.

Accordingly, for the foregoing reasons, Moynihan's motion to quash the subpoena is hereby granted.

SO ORDERED.