709 F.Supp.2d 283 (2010)
In re APPLICATION OF CHEVRON CORPORATION, Petitioner.
In re Application of Rodrigo Pérez Pallares and Richard Reis Veiga, Petitioners.
No. M-19-111.
United States District Court, S.D. New York.
May 6, 2010.
As Corrected May 10, 2010.
Opinion Denying Stay May 20, 2010.
*284 Randy M. Mastro, Scott A. Edelman, Andrea E. Neuman, Gibson Dunn & *285 Crutcher LLP, for Petitioner Chevron Corporation.
Paul E. Dans, Jorge A. Mestre, Andre Rivero, Rivero Mestre & Castro, for Petitioner Rodrigo Pérez Pallares.
Peter J. Kahn, Beth A. Stewart, Williams & Connolly LLP, for Petitioner Ricardo Reis Veiga.
Ilaan M. Maazel, Jonathan S. Abady, O. Andrew F. Wilson, Emery Celli Brinckerhoff & Abady LLP, for Respondents Lago Agrio Plaintiffs.
Maura J. Wogan, Jeremy S. Goldman, Frankfurt Kurnit Klein & Selz, P.C., for Respondents Joseph A. Berlinger, Michael Bonfiglio, Third Eye Motion Picture Co., Inc., Crude Productions, LLC, and @radical.media.

MEMORANDUM OPINION
LEWIS A. KAPLAN, District Judge.
These are applications pursuant to 28 U.S.C. § 1782 to issue subpoenas in connection with a multi-billion dollar Ecuadorian litigation against Chevron Corporation ("Chevron"), the threatened criminal prosecution in Ecuador of two of its attorneys, and an international arbitration. Specifically, Chevron and the attorneys seek to subpoena the "outtakes" of a documentary film entitled Crude, the making of which was solicited by the plaintiffs' lawyers and depicts events relating to the litigation. Respondents, the Ecuadorian plaintiffs and the documentary filmmaker, oppose the applications principally on the grounds that the discovery would undermine the Ecuadorian proceedings and that the material sought is protected by the journalists' privilege.

Facts

I. Background
These applications arise in the context of three decades of oil exploration and extraction in Ecuador by Texaco, Inc. ("Texaco"), which became a wholly-owned subsidiary of Chevron in 2001. The following is a brief summary of Texaco's activities in Ecuador and the nine-year litigation that ensued in this District.[1]

A. Texaco's Oil Operations in Ecuador
In 1964, Texaco Petroleum Company ("TexPet"), a subsidiary of Texaco, began oil exploration and drilling in the Oriente region of eastern Ecuador. In the following year, TexPet started operating a petroleum concession for a consortium owned in equal shares by TexPet and Gulf Oil Corporation (the "Consortium"). The government of Ecuador ("GOE") thereafter obtained Gulf Oil's interest through its stateowned oil company, Petroecuador, and became the majority stakeholder in the Consortium in 1976. TexPet operated a trans-Ecuadorian oil pipeline and the Consortium's drilling activities until 1990, when Petroecuador assumed those functions. Two years later, TexPet relinquished all of its interests in the Consortium, leaving it owned entirely by Petroecuador.[2]

B. The Aguinda Action

In 1993, a group of residents of the Oriente region of Ecuador brought a class action suit in this Court against Texaco arising from TexPet's operations in the *286 Consortium. The complaint in the action, captioned Aguinda v. Texaco, alleged that "between 1964 and 1992 Texaco's oil operation activities polluted the rain forests and rivers in Ecuador." The plaintiffs sought billions of dollars in damages on a variety of theories, including negligence, strict liability, and equity to "redress contamination of the water supplies and environment."[3]

C. Settlement and Release Agreements
While the Aguinda litigation was pending, TexPet entered into a 1995 settlement agreement with the GOE and Petroecuador (the "Settlement") whereby TexPet agreed to perform specified environmental remedial work in exchange for a release of claims by the GOE. The release, which covered TexPet, Texaco, and other related companies, encompassed "all the Government's and Petroecuador's claims against the Releasees for Environmental Impact from the Operations of the Consortium, except for those related to the obligations contracted" under the Settlement, which were to be "released as the Environmental Remedial Work is performed to the satisfaction of the Government and Petroecuador."[4]
Three years later, the GOE entered into an agreement with TexPet (the "Final Release") according to which the GOE deemed the Settlement to have been "fully performed and concluded" and "proceede[ed] to release, absolve, and discharge" TexPet and related companies "from any liability and claims ... for items related to the obligations assumed by Tex-Pet" in the Settlement.[5]

D. Dismissal of the Aguinda Action

In the meantime, Texaco worked in earnest to transfer the Aguinda action from this district to the courts of Ecuador on the grounds of forum non conveniens and international comity. Texaco touted the ability of the Ecuadorian courts to "provide a fair and alternative forum" for the plaintiffs' claims.[6] It argued also that the case did not belong in this district because the evidence and witnesses were predominantly in Ecuador. After nine years of litigation, this Court dismissed the case on forum non conveniens grounds in 2001.[7] The Second Circuit affirmed the dismissal the following year.[8]

II. Ecuadorian Litigation and Criminal Prosecutions

A. The Lago Agrio Litigation
In 2003, following the dismissal of the Aguinda action, a group of Ecuadorians including "a substantial number of the Aguinda Plaintiffs" brought an action against ChevronTexaco[9] in Lago Agrio, Ecuador (the "Lago Agrio Litigation"). Plaintiffs asserted claims for, among other things, violations of an Ecuadorian environmental law enacted in 1999. The defendants contended that the law in effect impermissibly allowed plaintiffs to assert, as private attorneys-general, claims that belonged to the GOE but were released pursuant to the Settlement and Final Release.[10] *287 The GOE announced that it would receive ninety percent of any recovery.[11]
The Lago Agrio court ordered a "global" assessment of damages to be conducted by a team of expert witnesses led by Richard Stalin Cabrera Vega, who was required to "perform his work in an impartial matter" and to "maintain strict independence with regard to the parties."[12] Dr. Carlos Beristain, who was appointed to Cabrera's team of expert witnesses, contributed to Cabrera's damages assessment for cancer deaths by meeting in "focus groups" with inhabitants of the region allegedly polluted by Chevron. As we shall see, Chevron maintains that Dr. Beristain failed to maintain "strict independence" with respect to counsel for the Lago Agrio plaintiffs.

B. Criminal Prosecution of Pallares and Veiga
The same year that the Lago Agrio Litigation was filed, the GOE filed a criminal complaint against two of Chevron's lawyers, petitioners Pallares and Veiga, and former GOE and Petroecuador officials, alleging that they had falsified public documents in connection with the Settlement and Final Release and had violated Ecuador's environmental laws.
In 2004, the Ecuadorian Prosecutor General began an investigation of the criminal charges. The District Prosecutor, however, found that "there [was] not sufficient evidence to pursue the case against... Mr. Ricardo Reis Veiga and Mr. Rodrigo Perez Pallares, representatives of TexPet."[13] The Ecuadorian Deputy Attorney General nevertheless explained in an email to plaintiffs' counsel in the Lago Agrio Litigation that the criminal prosecutions were a potential "way to nullify or undermine the value of the" Settlement and Final Release, though "evidence of criminal liability established by the Comptroller [General's] Office was rejected by the prosecutor."[14]

C. Plaintiffs' Counsel Solicits a Documentary Film
In 2005, Steven Donziger, one of the lead counsel for the plaintiffs in the Lago Agrio Litigation, solicited award-winning producer and filmmaker Joseph Berlinger to create a documentary depicting the Lago Agrio Litigation from the perspective of his clients. Berlinger recounted that:
"During the summer of 2005, a charismatic American environmental lawyer named Steven Donziger knocked on my Manhattan office door. He was running a class-action lawsuit on behalf of 30,000 Ecuadorian inhabitants of the Amazon rainforest and was looking for a filmmaker to tell his clients' story."[15]
For the next three years, Berlinger shadowed the plaintiffs' lawyers and filmed "the events and people surrounding the trial,"[16] compiling six hundred hours of raw footage.

D. President Correa Takes Office
In 2006, while the Lago Agrio Litigation was pending, Rafael Vincente Correa Delgato *288 was elected President of Ecuador on a platform of economic and social reform. President Correa, who describes himself as a "humanist," a "Christian of the left," and a proponent of twenty-first century socialism,[17] condemned Ecuador's oil contracts as "true entrapment for the country."[18] He accused oil companies of failing to meet environmental regulations and sought to divert a portion of their revenue to fund social programs.[19]
A short time after President Correa took office, he issued a press release "urg[ing] the Office of the Prosecutor to permit the Prosecution of the Petroecuador officials who accepted the remediation carried out by Texaco."[20] He thereafter appointed a new Prosecutor General, who decided that the criminal case against Pallares, Veiga, and former GOE officials should proceed.[21]
In 2009, Correa became the first Ecuadorian president in thirty years to be elected to a second term. He pledged that:
"Socialism will continue. The Ecuadorian people voted for that. We are going to emphasize this fight for social justice, for regional justice. We are going to continue the fight to eliminate all forms of workplace exploitation within our socialist conviction: the supremacy of human work over capital. Nobody is in any doubt that our preferential option is for the poorest people, we are here because of them. Hasta la victoria siempre!"[22]

E. The International Arbitration
The year that President Correa was reelected, Chevron commenced an arbitration pursuant to the Bilateral Investment Treaty between the United States and Ecuador ("BIT") and United Nations Commission on International Trade Law ("UNCITRAL") rules (the "Arbitration").[23] Chevron there asserts that the GOE "abuse[d] the criminal justice system" in connection with the Lago Agrio Litigation and the criminal prosecutions and violated the BIT and the American Convention on Civil Rights.[24] It seeks, among other things, dismissal of the Lago Agrio Litigation and a declaration that it "has no liability or responsibility for environmental impact ... arising out of the former Consortium that was jointly owned by TexPet and Ecuador."[25]

III. Berlinger Releases Crude
In 2009, Berlinger released his documentary, entitled Crude, which, according *289 to its own press package, "captures the evidentiary phase of the Lago Agrio trial, including field inspections and the appointment of independent expert Richard Cabrera to assess the region."[26] The film depicts also the environmental damage allegedly caused by TexPet and interviews with Ecuadorians dying of diseases perhaps caused by oil spills. Petitioners highlight the following scenes in connection with their applications.

A. Plaintiffs' Counsel Meets with Expert Witness
Crude contains footage of a number of meetings that took place in the Dureno community of the indigenous Cofan people. A version of Crude "streamed" over Netflix depicts one such meeting, at which Dr. Beristain, an expert who contributed to Cabrera's neutral damages assessment, is shown working directly with both the Cofan people and plaintiffs' counsel.[27] Berlinger, however, altered the scene at the direction of plaintiffs' counsel to conceal all images of Dr. Beristain before Crude was released on DVD.[28] The interaction between plaintiffs' counsel and Dr. Beristain therefore does not appear in the final version of Crude sold on DVD in the United States.

B. Plaintiff's Counsel Interferes with Judicial Inspection
In another scene of Crude, Donziger, one of plaintiffs' lead counsel, persuades an Ecuadorian judge, apparently in the presence of Chevron's lawyers and news media, to block the judicial inspection of a laboratory allegedly being used by the Lago Agrio plaintiffs to test for environmental contamination. Donziger describes his use of "pressure tactics" to influence the judge and concedes that "[t]his is something you would never do in the United States, but Ecuador, you know, this is how the game is played, it's dirty."[29]

C. Plaintiffs' Representatives Meet with the Ecuadorian Government
In another scene, a representative of the plaintiffs informs Donziger that he had left the office of President Correa "after coordinating everything."[30] Donziger declares, "Congratulations. We've achieved something very important in this case.... Now we are friends with the President." The film then offers a glimpse of a meeting between President Correa and plaintiffs' counsel that takes place on a helicopter. Later on, President Correa embraces Donziger and says, "Wonderful, keep it up!"
Donziger explains also that President Correa had called for criminal prosecutions to proceed against those who engineered the Settlement and Final Release. "Correa just said that anyone in the Ecuador government who approved the so-called remediation is now going to be subject to litigation in Ecuador. Those guys are shittin' in their pants right now."[31]

IV. The Applications
Chevron and its attorneys, Pallares and Veiga, file these applications pursuant to *290 28 U.S.C. § 1782 to obtain "the production of all `Crude' footage that was shot, acquired, or licensed in connection with the movie `Crude.'"[32] They assert that the Crude outtakes are "highly likely to be directly relevant" to the Lago Agrio Litigation, the Arbitration, and the criminal proceedings against Pallares and Vega.[33]

Discussion

I. Judicial Code Section 1782
Section 1782 of the Judicial Code provides in pertinent part:
"The district court of the district in which a person resides or is found may order him to give his testimony or statement or to produce a document or other thing for use in a proceeding in a foreign or international tribunal, including criminal investigations conducted before formal accusation. The order may be made pursuant to a ... request made by a foreign or international tribunal or upon the application of any interested person.... A person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."[34]
A district court is authorized to grant a Section 1782 application where (1) the person from whom discovery is sought resides or is found in the district of the district court to which the application is made, (2) the discovery is for use in a proceeding before a foreign tribunal, and (3) the application is made by a foreign or international tribunal or "any interested person."[35] A district court, however, is not required to grant a Section 1782 application simply because it has the authority to do so.[36] "Once the statutory requirements are met, a district court is free to grant discovery in its discretion."[37]
The Supreme Court has identified four factors to guide the Court's determination whether to grant a Section 1782 application: (1) whether the material sought is within the foreign tribunal's jurisdictional reach and thus accessible absent Section 1782 aid; (2) the nature of the foreign tribunal, the character of the proceedings underway abroad, and the receptivity of the foreign government or the court or agency abroad to U.S. federal-court jurisdictional assistance; (3) whether the Section 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions or other policies of a foreign country or the United States; and (4) whether the subpoena contains unduly intrusive or burdensome requests.[38] In addition, "district courts must exercise their discretion under Section 1782 in light of the twin aims of the statute: `providing efficient means of assistance to participants in international litigation in our federal courts and encouraging foreign countries by example to provide similar means of assistance to our courts.'"[39]

*291 A. Statutory Requirements

Joseph Berlinger, the producer of Crude, is located in New York and concededly is in sole possession of the film's raw footage. Chevron is an "interested person" because it is a party to the Lago Agrio Litigation and the Arbitration. Pallares and Veiga likewise are "interested" because they are threatened with criminal charges in Ecuador. Petitioners therefore have satisfied the first two factors.
As to the third factor, respondents do not dispute that the Ecuadorian court is a foreign tribunal. They nevertheless contend that the arbitral tribunal does not constitute a "foreign or international tribunal" within the meaning of Section 1782. Respondents rely on National Broadcasting Co. v. Bear Stearns & Co.,[40] in which the Second Circuit held that a commercial arbitration panel in Mexico conducted under the auspices of the International Chamber of Commerce was beyond the scope of Section 1782 because "Congress did not intend for that statute to apply to an arbitral body established by private parties."[41] Respondents' argument is without merit.
As an initial matter, the arbitration here at issue is not pending in an arbitral tribunal established by private parties. It is pending in a tribunal established by an international treaty, the BIT between the United States and Ecuador, and pursuant to UNCITRAL rules.[42] Further, in Intel Corp. v. Advanced Micro Devices, Inc.,[43] which postdated National Broadcasting, the Supreme Court in dictum quoted a law review article for the proposition that "[t]he term `tribunal' ... includes investigating magistrates, administrative and arbitral tribunals, and quasi-judicial agencies, as well as conventional civil, commercial, criminal, and administrative courts."[44] In the wake of Intel, at least two district courts in our Circuit and one in the Third Circuit have followed the Supreme Court's dictum and held that international arbitral bodies operating under UNCITRAL rules constitute "foreign tribunals" for purposes of Section 1782.[45] This Court agrees.
In consequence, petitioners have satisfied the threshold requirements of Section 1782.

B. Discretionary Factors
Respondents assert that the discretionary factors cut in their favor. They argue that petitioners have attempted to circumvent the policies and restrictions of the Ecuadorian court and that their discovery request is unduly burdensome. Petitioners respond that courts have granted Section 1782 applications routinely in connection with the Lago Agio Litigation and, in any event, that the discovery sought would *292 place "little or no burden" on respondents.[46]

1. The Jurisdictional Reach of the Foreign Tribunal
"A foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce the evidence."[47] The first factor therefore weighs against granting discovery where the person from whom discovery is sought is a participant in the foreign proceeding. On the other hand, "nonparticipants in the foreign proceeding may be outside the foreign tribunal's jurisdictional reach; hence, their evidence, available in the United States, may be unobtainable absent § 1782(a) aid."[48]
Berlinger, who is in sole possession of the raw footage of Crude, is located in this district and is not a party to any of the foreign proceedings. The Ecuadorian court and the arbitral tribunal lack jurisdiction to compel Berlinger to produce the material. The first of the discretionary factors therefore favors petitioners.

2. The Nature and Receptivity of the Foreign Tribunals
In April 2010, respondents filed an application with the Lago Agrio court requesting a ruling "concerning its receptivity to evidence gathered in Chevron's various Section 1782 applications."[49] That court has not yet ruled. Respondents nevertheless assert that granting petitioners' applications would undermine the Ecuadorian court and therefore frustrate the comity interests underlying the statute.[50]
The first point to be made is that respondents point does not even address the fact that the applications are made not only for the Ecuadorian litigation, but also for the Arbitration. In consequence, even if their argument were persuasive as respects Ecuador, it would not carry the day. And it is not persuasive as to Ecuador in any case.
While the views of the Ecuadorian court could be helpful, even opposition by it to these applications would not be dispositive.[51] District courts have granted Section 1782 applications routinely in connection with matters pending in Ecuadorian courts, including the Lago Agrio Litigation.[52] Moreover, it must be borne in mind that the petitioners seek relief here in part out of concern that political influence may have been brought to bear in Ecuador in an inappropriate way.
In all the circumstances, this factor surely favors petitioners insofar as the Arbitration is concerned and does so, albeit perhaps less strongly, with respect to the Lago Agrio litigation.

3. Whether Petitioners Attempt to Circumvent Foreign Proof-Gathering Restrictions and Policies
Respondents assert that petitioners have attempted to circumvent the proofgathering restrictions of the Ecuadorian *293 court because they "did not even try to get discovery" from it before filing the instant applications. But the case on which respondents rely, Aventis Pharma v. Wyeth,[53] is distinguishable because the foreign tribunal there had "jurisdictional reach of the[ ] documents."[54] Here, neither the Ecuadorian court nor the arbitral tribunal could compel Berlinger to produce the outtakes because he is not a party to the foreign proceedings or subject to their writs. Respondents' argument therefore is without merit.

4. Whether the Discovery Would Be Intrusive or Burdensome
Respondents argue that complying with a subpoena to produce six hundred hours of Crude raw footage would be unduly burdensome because it would (1) impose administrative costs on Berlinger and (2) inhibit Berlinger's ability to obtain material from sources in confidence. These arguments are unpersuasive.
Requiring Berlinger to make the raw footage available to petitioners would impose minimal administrative costs on him. Petitioners, not Berlinger, would bear the burden of copying, editing, and reviewing the material. Indeed, the burden of resisting the subpoenas undoubtedly already has imposed a greater burden on Berlinger than would compliance.
Nor would the production of the outtakes compromise Berlinger's ability to obtain material from sources in confidence. For reasons discussed in connection with Berlinger's claim of journalist privilege, the Court does not credit any assertion that the discovery of the outtakes by petitioners would compromise the ability of Berlinger or, for that matter, any other film maker, to obtain material from individuals interested in confidential treatment. These subpoenas would impose no undue burden on respondents.

* * *
In sum, petitioners have satisfied the Intel discretionary factors.

II. The Journalist Privilege
Under Section 1782, "[a] person may not be compelled to give his testimony or statement or to produce a document or other thing in violation of any legally applicable privilege."[55] Respondents assert that the Crude raw footage is protected from disclosure by the journalists' privilege. Petitioners rejoin that they overcome the qualified privilege on the ground that the material sought is highly likely to be relevant to the foreign proceedings.
The Second Circuit "has long recognized the existence of a qualified privilege for journalistic information."[56] The privilege protects against "the wholesale exposure of press files to litigant scrutiny," "the heavy costs of subpoena compliance," and the likelihood that "potential sources [would be] deterred from speaking to the press, or [would] insist[] on remaining anonymous, because of the likelihood that they would be sucked into litigation."[57]
The threshold issue is whether Crude falls within the journalists' privilege. Petitioners contend that the privilege does not apply to documentary films and, in any event, that Crude "was not the result of a newsgathering process, but rather ... is a *294 piece of theater deliberately designed to win over audiences to the Plaintiffs' side and to facilitate the Lago Agrio Litigation."[58]
The Second Circuit has not addressed squarely whether the journalists' privilege encompasses a documentary film. It nevertheless has stated that "an individual successfully may assert the journalist's privilege if he is involved in activities traditionally associated with the gathering and dissemination of news, even though he may not ordinarily be a member of the institutionalized press."[59]
To create Crude, Berlinger investigated "the events and people surrounding" the Lago Agrio Litigation, a newsworthy event, and disseminated his film to the public. The Court therefore assumes that the qualified journalists' privilege applies to Berlinger's raw footage.

A. Confidentiality
The protection afforded by the journalists' privilege turns on whether the material sought is confidential or nonconfidential. "[W]hile nonconfidential press materials are protected by a qualified privilege, the showing needed to overcome the privilege is less demanding than the showing required where confidential materials are sought."[60] It is the journalist's burden to demonstrate that the material he or she seeks to protect from disclosure is confidential.[61]
Respondents argue that the outtakes of Crude are confidential because Berlinger (1) "entered into agreements with some of [his] sources, promising that [he] would not use certain footage in which they appeared without first obtaining their express authorization,"[62] and (2) in all cases "built a foundation of trust with the subjects of his film," who were depicted in "sensitive, painful and conflict-ridden situations."[63] They therefore contend that there was an "implicit (and sometimes explicit) understanding that the materials Berlinger decides to leave out of the finished product would remain confidential and not turned over to third parties."[64] Respondents' contentions are not persuasive.
First, Berlinger's assertion that he is prohibited by confidentiality agreements from using "certain footage" absent the consent of "some" of his sources is conclusory. He does not identify any source or subject with whom he has such an agreement. He does not identify any particular footage allegedly covered by any such agreements. He does not even state whether the footage allegedly subject to such understandings is included in the outtakes or, instead, already is in the publicly available documentary. And he makes no effort to reconcile the claim of explicit assurances of confidentiality with the standard form of release he obtained from his subjects, which granted him carte blanche *295 to use all of the footage in his production.[65] He therefore has not sustained his burden of establishing that any of the material sought is subject to any confidentiality agreement.[66]
This leaves for consideration two other categories of footage. The first is that involving subjects to whom no explicit assurances were given at all. The second is footage involving those to whom explicit assurances were given, but that is not included in the portion as to which those assurances were provided. The argument, however, is the same in each case, viz., that Berlinger had tacit understandings of confidentiality based on "trust." This argument is even less persuasive.
Berlinger no doubt won the confidence of many of his subjects. The standard release that his subjects signed, however, expressly disclaims any expectation of confidentiality.[67] In any event, all of Berlinger's subjects appeared on camera for the very purpose of having their images and words shown publicly in whatever film Berlinger decided to create.[68] With perhaps some exceptions as to some footage, Berlinger alone retained control of the content of the film and determined what footage would be made public. To that extent, there could not possibly have been any understanding of confidentiality, as Berlinger had the uncontrolled right to make public all or any part of the footage that he desired. I therefore find that Berlinger has not sustained his burden of demonstrating confidentiality for purposes of the journalist privilege.[69]

B. Protection of Nonconfidential Material
"Where a civil litigant seeks nonconfidential materials from a nonparty press entity, the litigant is entitled to the requested discovery notwithstanding a valid assertion of the journalist privilege if he can show that the materials at issue are of likely relevance to a significant issue in the case, and are not reasonably obtainable from other available sources."[70]

1. Relevance
Chevron contends that there is ample reason to believe that the Crude outtakes *296 would be relevant to the Lago Agio Litigation and the Arbitration given that Berlinger was solicited by plaintiffs' counsel to create the film, had vast access to events relating to the litigation, and filmed extraordinary interactions between plaintiffs' counsel, on the one hand, and an expert witness and the GOE, on the other. Pallares and Veiga likewise contend that the outtakes would be relevant to their criminal proceedings because they likely would show that those proceedings are tainted by plaintiffs' counsel's influence and improper meddling with the Ecuadorian judiciary on the part of the GOE. Respondents argue that petitioners' have not met their burden of demonstrating relevance because they are engaged in a "fishing expedition" based purely upon speculation about the content of the outtakes.

a. The Lago Agrio Litigation and the Arbitration
Chevron contends that three scenes of Crude are "concrete evidence" that the outtakes of the film are "more than likely relevant" to Chevron's claims and defenses in the Lago Agrio Litigation and the Arbitration.
First, Chevron asserts that Crude contains footage of plaintiffs' counsel's participation in one of Beristain's supposedly "neutral" focus groups, which he conducted in furtherance of his damages assessment. It argues that Beristain therefore was "biased by the direct participation of the plaintiff's counsel" in the performance of his task. Berlinger, moreover, concededly edited the scene at the direction of plaintiffs' counsel to remove all images of Beristain before Crude was released on DVD, a fact suggestive of an awareness of questionable activity. Chevron therefore, contends that the outtakes are likely to depict plaintiffs' counsel's interaction with at least one supposedly neutral expert who was engaged pursuant to court direction.[71]
Second, Crude depicts plaintiffs' counsel Steven Donziger's use of what he called "pressure tactics" to influence a judge to prevent the judicial inspection of a laboratory allegedly being used by the Lago Agrio plaintiffs to test for environmental contamination. Donziger declares that "[t]his is something you would never do in the United States, but Ecuador, you know, this is how the game is played, it's dirty."[72] Chevron argues that the Crude outtakes are highly likely to depict plaintiffs' improper influence on the Ecuadorian judicial system.[73]
Third, petitioners highlight the Crude scene in which a representative of plaintiffs visits the office of the president of Ecuador "after coordinating everything." Donziger responds that "We've achieved something very important in this case.... Now we are friends with the President." Chevron argues that the outtakes are likely to depict plaintiffs' attempts to "curry favor" with the GOE.[74]
Respondents rejoin that Chevron has failed to meet its burden of demonstrating the relevance of the outtakes. First, they argue that the meeting between Beristain and plaintiff's counsel was not one of Beristain's independent focus groups because Beristain had not yet begun his damages "field work" at the time the meeting took place.[75] They assert that Berlinger edited the scene so that it would not be "taken out of context" and viewed as a meeting *297 conducted in furtherance of Beristain's damages assessment. They therefore maintain that Chevron's "assumption that unreleased footage not in the film is also relevant is entirely speculative."[76] Second, respondents argue in the alternative that petitioners have failed "to particularize a specific portion of th[e] footage ... that they believe is relevant."[77] These arguments are not persuasive. Any interaction between plaintiffs' counsel and a supposedly neutral expert in the Lago Agrio Litigation would be relevant to whether the expert is independent and his damages assessment reliable. Plaintiffs' counsel's interactions with the Ecuadorian judiciary and government officials likewise would be relevant to Chevron's Arbitration claims for denial of due process and violations of the Settlement and Release agreements and the BIT.[78] The fact that Crude contains only excerpts of footage depicting such interactions amply supports an inference that the outtakes contain additional relevant material.
Further, Donziger in fact solicited Berlinger to create a documentary of the litigation from the perspective of his clients. Berlinger in turn was given "extraordinary access to players on all sides of the legal fight and beyond."[79] Plaintiffs' counsel indeed are on the screen throughout most of Crude,[80] which contains less than one percent of the total footage Berlinger shot in connection with the litigation. Berlinger concededly removed at least one scene from the final version of Crude at their direction.[81] In these circumstances, there is considerable reason to believe that the outtakes are relevant to significant issues in the Lago Agrio Litigation and the Arbitration, including whether plaintiffs' counsel improperly influenced expert witnesses and the GOE.[82]
Finally, respondents' assertion that the applications are insufficiently particular is unavailing. As an initial matter, there is no uncertainty as to the type of evidence petitioners seek. Respondents, however, have refused to provide any information whatsoever as to the content of the outtakes. Petitioners cannot reasonably be expected to identify with particularity the outtakes that they seek where knowledge of their content lies exclusively with Berlinger.[83]

b. The Criminal Proceedings
Pallares and Veiga assert that the outtakes are relevant to their criminal proceedings because the outtakes are likely to depict (1) efforts "to bring unfounded criminal charges," (2) the "joint strategy" of plaintiffs' lawyers and the GOE, and (3) "procedural irregularities in the criminal case."[84] Respondents maintain that Crude contains only one passing reference to criminal proceedings and that there is *298 no basis upon which to infer that the outtakes contain any relevant material.[85]
The released version of Crude nevertheless depicts interactions which suggest the possibility of misconduct on the part of both plaintiffs' counsel and GOE. In all the circumstances, it is likely that the outtakes will be relevant to significant issues in the prosecutions, including whether the prosecutions were motivated by a desire to put pressure on Chevron in the Lago Agrio Litigation and the role, if any, that plaintiffs' counsel and the GOE played in those proceedings.

2. Availability from Other Sources
Respondents argue that petitioners have failed to meet their burden because the outtakes would be "cumulative or duplicative of the decades-worth of scientific reports and analyses performed by Chevron."[86] Their argument is inapposite. The issue is here is not whether the evidence petitioners seek would shed light on issues such as the existence and source of any pollution in the Ecuadoran Amazonian forests. It is whether there is sufficient ground to believe that the footage petitioners seek would not reasonably be obtainable elsewhere.[87]
Respondents argue that petitioners have not satisfied their burden with respect to footage of plaintiffs' alleged interference with judicial inspections because those events allegedly were witnessed by "Chevron's attorneys, often accompanied by their own cameras."[88] The argument, however, is not persuasive, as indicated by Gonzales v. National Broadcasting Co.[89]
In that case, NBC asserted that outtakes of Dateline were protected from disclosure by the journalist privilege on the ground that evidence of the event in question was available elsewhere. The Second Circuit, however, was "persuaded that the outtakes contain information that is not reasonably obtainable from other available sources, because they can provide unimpeachably objective evidence of [defendant's] conduct." It found also that "a deposition is not an adequate substitute for the information that may be obtained from the videotapes."[90]
The same rationale applies here. Berlinger, who is in sole possession of the Crude outtakes, concededly was "shocked at the almost unprecedented access" he was granted "behind the scenes of the Lago Agrio Litigation.[91] The raw footage he compiled would be "unimpeachably objective" evidence of any misconduct on the part of plaintiffs' counsel, expert witnesses, or the GOE. Petitioners therefore have shown that the material they seek would not reasonably be obtainable from other sources.
In consequence, petitioners have overcome the qualified journalists' privilege.

Conclusion
The Court is not blind to the broader context in which the current applications appear. Chevron fought a long and ultimately successful battle to obtain dismissal of plaintiffs' original lawsuit in this Court on forum non conveniens grounds. During that battle, it extolled the virtues of the Ecuadorian legal system while the *299 plaintiffs questioned its abilities and rectitude.[92] The present positions of Chevron and the plaintiffsChevron's claim that it is or is about to become a victim of political influence on the Ecuadorian courts and prosecutors or worse and plaintiffs' pleas for deference to those institutionsthus represent dramatic reversals that are in considerable tension, to say the least, with their past arguments. The reason for these reversals, however, perhaps is not difficult to understand.
Ecuador in recent years has seen the ascendency of a socialist government that is not as well disposed to private oil interests as its predecessor. Moreover, the State Department last year observed:
"While the constitution [of Ecuador] provides for an independent judiciary, in practice the judiciary was at times susceptible to outside pressure and corruption. The media reported on the susceptibility of the judiciary to bribes for favorable decisions and resolution of legal cases and on judges parceling out cases to outside lawyers who wrote judicial sentences on cases before the court and sent them back to the presiding judge for signature. Judges occasionally reached decisions based on media influence or political and economic pressures."[93]
It went on to note that "there continued to be problems in ... corruption and denial of due process within the judicial system."[94] Thus, one readily sees why Chevron and the lawyer petitioners now might be concerned about their fate in the Ecuadorian courts, regardless of whether events ultimately will prove those concerns to be justified. And, indeed, so too was the concern that undoubtedly motivated plaintiffs, at least in part, previously to resist Chevron's earlier effort to force this dispute into Ecuadorian courts during the tenure of a previous and (to Chevron) perhaps more favorably disposed government.
The Court expresses no view as to whether the concerns of either side are supported by proof of improper political influence, corruption, or other misconduct affecting the Ecuadorian proceedings. As Justice Brandeis once wrote, however, "sunlight is said to be the best of disinfectants."[95] Review of Berlinger's outtakes will contribute to the goal of seeing not only that justice is done, but that it appears to be done.
In all of the circumstances, petitioners' applications pursuant to 28 U.S.C. § 1782 to subpoena the raw footage of Joseph Berlinger's Crude and for a deposition to authenticate it are granted.
SO ORDERED.

MEMORANDUM OPINION
On May 6, 2010, the Court granted petitioners' applications for the issuance of subpoenas requiring respondent Berlinger to produce the video he shot in the course of filming for the production of his documentary, Crude, that was not included in the publicly released production (the "Outtakes") and respondents to appear for a deposition solely to authenticate the Outtakes. Mr. Berlinger and the respondents affiliated with him (collectively, "Berlinger") then were served with subpoenas returnable *300 on May 21, 2010. Berlinger and the other respondents (the "Lago Agrio Plaintiffs") now move for a stay pending appeal from the order granting the applications to issue subpoenas. The Court assumes familiarity with its previous opinion.[1]

I
In considering whether to issue a stay pending appeal, courts consider four factors: "`(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'"[2] "The necessary `level' or `degree' of possibility of success will vary according to the court's assessment of the other [stay] factors."[3]

II

A. Likelihood of Success

1. Appellate Jurisdiction
In evaluating a litigant's likelihood of success on appeal, a court is obliged to consider the likelihood that the Court of Appeals has jurisdiction over the order appealed from as well as the prospects for reversal assuming the existence of appellate jurisdiction.[4]
Berlinger neither has refused to comply with the subpoenas nor been held in contempt for refusing. This raises a substantial question as to whether and to what extent the order appealed from is appealable. Moreover, the movants are not in all respects situated identically in this regard.
The Second Circuit has summarized the general rule as follows:
"Section 1291 permits review only of `final' district court orders. See 28 U.S.C. § 1291. The general rule is that orders enforcing subpoenas issued in connection with civil and criminal actions, or grand jury proceedings, are not final, and therefore not appealable. United States v. Ryan, 402 U.S. 530, 532-33, 91 S.Ct. 1580, 1581-82, 29 L.Ed.2d 85 (1971); Cobbledick v. United States, 309 U.S. 323, 328, 60 S.Ct. 540, 542-43, 84 L.Ed. 783 (1940); Reich v. National Eng'g & Contracting Co., 13 F.3d 93, 95 (4th Cir.1993); Kemp v. Gay, 947 F.2d 1493, 1495 (D.C.Cir.1991). To obtain appellate review, the subpoenaed party must defy the district court's enforcement order, be held in contempt, and then appeal the contempt order, which is regarded as final under § 1291. Ryan, 402 U.S. at 532, 91 S.Ct. at 1581; Cobbledick, 309 U.S. at 328, 60 S.Ct. at 543; National Eng'g, 13 F.3d at 95; Kemp, 947 F.2d at 1495."[5]
This is true whether the person to whom the subpoena is addressed is a party or a *301 non-party.[6] It therefore follows that an order issuing subpoenas is not appealable. Yet there is some question whether the general rule applies in this case.
The purpose of the general rule "is to discourage parties from pursuing appeals from orders enforcing . . . subpoenas, which would temporarily halt the district court's litigation process or the grand jury process."[7] Accordingly, the Circuit has held that an order enforcing an administrative agency subpoena is "final" for purposes of appellate review on the theory that the enforcement of an agency subpoena concludes proceedings in the district court.[8] The witness in such a case need not first be held in contempt.
These subpoenas fall somewhere between process issued in an ordinary civil or criminal case and an administrative agency subpoena. As the Section 1782 application is a stand-alone proceeding ancillary to litigation in Ecuador and the arbitral tribunal, "the district court's litigation process" is limited to the issuance and enforcement of the subpoenas. It therefore can be argued that the litigation in this Court is over and that an appeal would not delay any proceedings here.
Our Circuit indeed held in In re Matter of Letters Rogatory[9] that an order denying a motion to quash the issuance of a Section 1782 subpoena was final and therefore appealable on the basis that "the proceeding before the district court to compel testimony [pursuant to Section 1782] stands separate from the main controversy." [10] In so doing, however, the court noted that the witness from whom testimony was sought would be "unlikely" to "obtain review by allowing himself to be cited for contempt" because he was a third-party to the foreign proceeding and therefore had "no stake in the basic controversy." This case, however, is different in that Berlinger, the subject of the subpoenas, is the holder of an alleged privilege and thus has an important incentive to allow himself to be cited for contempt in order to seek appellate review. This distinguishes Letters Rogatory, as indicated by our Circuit's recent decision in In re Air Crash at Belle Harbor, NY.[11]
In that case, the defendants served a subpoena on a non-party lawyer who represented a journalist and served also as a consultant to the plaintiffs' attorneys. The lawyer objected to the subpoena on the grounds, among others, that it called for the production of materials protected by the attorney-client privilege and exempt from disclosure under reporters' shield laws. The district court overruled the privilege claims and ordered the lawyer to produce the requested documents and to appear for a deposition. The lawyer appealed. But the Second Circuit dismissed the appeal on the ground that the order appealed from was not final. In so doing, it "decline[d] to dispense with the ordinary contempt requirement . . . in cases where a non-party lawyer asserts either his own or his client's privileges" and made clear *302 that the lawyer would have to "submit to contempt before the District Court's order to appear for a deposition and produce documents [would] be appealable."[12] It did so notwithstanding the lawyer's assertion, on behalf of his journalist client, that the information sought was protected under reporters' shield laws.
As in Belle Harbor, the privilege here is claimed by the non-party, Berlinger, who has both the ability and the incentive to place himself in contempt in order to appeal the decision in an effort to pursue his claim of privilege. While the issue of appealability in Belle Harbor arose in the context of a multidistrict litigation consolidated for pretrial proceedings in this district rather than an arguably stand-alone ancillary proceeding, Belle Harbor alone suggests that the order may not be final as to Berlinger. Moreover, two additional points, not mentioned in Letters Rogatory, suggest that Letters Rogatory and its progeny would not control here.
First, Section 1782(a) provides that "the testimony or statement shall be taken, and the document or other thing produced, in accordance with the Federal Rules of Civil Procedure." This suggests that the statute itself contemplates the issuance of a subpoena[13] or an order to produce and then, in the event of noncompliance, an application for sanctions,[14] which may include contempt.[15] The significance of that fact is plain from Stolt-Nielsen SA v. Celanese AG,[16] where the Circuit suggested, albeit without deciding, that an order enforcing an arbitration subpoena against a non-party might not be final in light of reference in the Federal Arbitration Act to enforcement of such subpoenas by contempt and the strong congressional policy against piecemeal appeals.[17]
Moreover, the broader context of a Section 1782 application is relevant also. The statute creates an ancillary remedy to farther the just resolution of litigations and arbitrations in other fora. Just as the general rule requiring a contempt finding as a prerequisite to an appeal in an ordinary civil litigation in a district court promotes the progress of such a lawsuit by avoiding premature and possibly unnecessary appeals, so too would application of that rule where the order in question is issued in aid of a foreign litigation or arbitration.[18] "Requiring the subject of a subpoena to submit to contempt before appealing [would] promote[] the `strong congressional policy'embodied in 28 U.S.C. § 1291`against piecemeal reviews, and against obstructing, or impeding an ongoing . . . proceeding by interlocutory appeals.'"[19] Thus, there is significant doubt as to the finality of the order appealed from insofar as it applies to Berlinger.
*303 The situation of the Lago Agrio Plaintiffs is somewhat different. They correctly argue that, at least as far as the record discloses, they have no control over whether Berlinger will risk contempt in order to obtain a final order. Thus, without precisely saying so, they invoke "the so-called Perlman [v. United States, 247 U.S. 7, 38 S.Ct. 417, 62 L.Ed. 950 (1918)] exception to the rule requiring the subject of a subpoena to submit to contempt before a district court's order compelling compliance with the subpoena is appealable."[20] As the Second Circuit held in Belle Harbor, however, "the Perlman exception is relevant only to appeals brought by the holder of a privilege where the disputed subpoena is directed at someone else."[21] As the claim here is that Berlinger is the holder of the privilege, the foregoing analysis suggests that there is substantial doubt also that the order, insofar as it overruled the privilege claim, is final even as it relates to the Lago Agrio Plaintiffs.
This conclusion is not dispositive of the question whether the order is final as to the Lago Agrio Plaintiffs insofar as the order concluded that the Section 1782 prerequisites were satisfied and exercised its discretion to issue the subpoenas. But it is uncertain also whether the appellate court would apply Letters Rogatory to conclude that the order is final as to the Lago Agrio Plaintiffs in that respect. In view of the Circuit's statements in Stolt-Nielsen, the reference in Section 1782 to the production of evidence "in accordance with the Federal Rules of Civil Procedure," which include the remedy of contempt for non-compliance, could lead to a different outcome here. Thus, it is well within the realm of possibility that the order is not final in any respect even as to the Lago Agrio Plaintiffs.
Of course, the question whether the Court of Appeals has jurisdiction of respondents' appeals[22] is a matter for determination by that court, not this one. But this Court is obliged to consider how the Court of Appeals is likely to resolve the issue in determining whether respondents are likely to prevail in that Court. In all the circumstances, it is debatable whether respondents would prevail on their contention that the order appealed from is final in any respect as to Berlinger or, insofar as the order overruled Berlinger's privilege claim, as to the Lago Agrio Plaintiffs. The Lago Agrio Plaintiffs' prospects for establishing appellate jurisdiction over the other aspects of the order are more favorable. These conclusions bear upon the Court's assessment of respondents' overall likelihood of success on appeal.

2. The Merits
Berlinger argues that this Court erred in determining that all of the Outtakes are relevant and that the material is not obtainable from other available sources. He contends that it erred also in "completely disregarding Second Circuit precedent" in overruling his claim of journalist privilege. The Lago Agrio Plaintiffs join in the journalist privilege argument and contend that *304 the Court abused its discretion in granting relief under Section 1782 and that the arbitral panel is not a "foreign or international tribunal" within the meaning of the statute. .These contentions are unpersuasive. In light of the Court's earlier opinion, it is unnecessary to treat them at length. But a few words are in order on certain points.
As initial matter, it is well to bear in mind that a district court's decision to grant discovery under Section 1782 is reviewed for abuse of discretion.[23] This means that appellate review of the Court's construction of the statute is reviewed de novo, but review of a decision to grant discovery, assuming no error of law, is much more deferential.[24]

(a) Relevance
Berlinger argues that this Court erred in "ruling that the Chevron Parties established the relevance of all of the undisclosed outtakes, based solely on its finding that the distributed film includes three scenes depicting relevant material."[25] But that is not an accurate account of the decision. Nor does it give due regard to the consequences of the position taken here by Berlinger.
As an initial matter, Berlinger overstates both the showing required by Gonzales v. National Broadcasting Co.[26] and this Court's holding. Gonzales does not require a showing that all subpoenaed material is relevant. Rather, it held that a claim of journalist privilege with respect to nonconfidential material is overcome, insofar as is pertinent to this point, upon a showing that "the materials at issue are of likely relevance to a significant issue in the case."[27] It was that standard that this Court held was satisfied. Berlinger's repeated assertions, on this motion, that the Court determined that every inch of the Outtakes is relevant are inaccurate.
Nor did this Court rest its finding of likely relevancewhich Berlinger conceded at argument of this motion is reviewable only for clear error of fact or abuse of discretionsolely on the three segments to which Berlinger refers. It described the three segments, but it stated also:
"Any interaction between plaintiffs' counsel and a supposedly neutral expert in the Lago Agrio Litigation would be relevant to whether the expert is independent and his damages assessment reliable. Plaintiffs' counsel's interactions with the Ecuadorian judiciary and government officials likewise would be relevant to Chevron's Arbitration claims for denial of due process and violations of the Settlement and Release agreements and the BIT [Bilateral Investment Treaty]. The fact that Crude contains only excerpts of footage depicting such interactions amply supports an inference that the outtakes contain additional relevant material.
"Further, Donziger [one of the Lago Agrio Plaintiffs' lawyers] in fact solicited Berlinger to create a documentary of the litigation from the perspective of his clients. Berlinger in turn was given `extraordinary access to players on all sides

*305 of the legal fight and beyond.' Plaintiffs' counsel indeed are on the screen throughout most of Crude, which contains less than one percent of the total footage Berlinger shot in connection with the litigation. Berlinger concededly removed at least one scene from the final version of Crude at their direction. In these circumstances, there is considerable reason to believe that the outtakes are relevant to significant issues in the Lago Agrio Litigation and the Arbitration, including whether plaintiffs' counsel improperly influenced expert witnesses and the GOE."[28]
The finding of likely relevance accordingly rests on a far broader base than Berlinger acknowledges. The probability that it will be overturned, particularly the deferential scope of appellate review, therefore does not appear to be at all strong.
The chance of reversal on this point, in this Court's view, is diminished by Berlinger's stance with respect to the Outtakes. He complains that the petitioners did not identify relevant Outtakes with particularity. Not only does that argument disregard the fact that Gonzales requires only a showing of likely relevance, but it ignores the fact that Berlinger failed "to provide any information whatsoever as to the content of the outtakes."[29] As the Court explained previously, "[p]etitioners cannot reasonably be expected to identify with particularity the outtakes that they seek where knowledge of their content lies exclusively with Berlinger."[30] This principle is common in our law.[31]

(b) Other Sources
Berlinger next attacks a straw man by arguing that "[t]here is nothing in the film or the Footage that would not be cumulative or duplicative of the decades-worth of scientific reports and analyses performed by Chevron and the plaintiffs" depicting the environmental harm attributed to Chevron and its impact on the indigenous population."[32] But this Court never suggested the contrary, and Berlinger ignores the basis for the Court's conclusion that there is no alternative source for information contained in the Outtakes.
Berlinger was invited by plaintiffs' counsel to make this film in order to "document[] . . . the [Lago Agrio] litigation from the perspective of" the plaintiffs.[33] *306 As his press package for the film stated, he was given "extraordinary access to players on all sides of the legal fight and beyond."[34] Plaintiffs' counsel are on screen through much of the film in what obviously are excerpts of more footage of the events in which they are shown, including among other things meetings with the president of Ecuador on a government helicopter and with a Philadelphia class action lawyer who is said to be financing the litigation. The film depicts also portions of events pertinent to the neutrality of at least one expert and attempts by plaintiffs' counsel to exert or benefit from perhaps improper political and other interference with the judicial process in Ecuador. In fact, Berlinger acknowledges that he removed at least one scene from the final version of Crude at the direction of plaintiffs' counsel.[35] The Court therefore held that:
"The raw footage he compiled would be `unimpeachably objective' evidence of any misconduct on the part of plaintiffs' counsel, expert witnesses, or the GOE. Petitioners therefore have shown that the material they seek would not reasonably be obtainable from other sources."[36]
Contrary to Berlinger's present argument, the Court did not even remotely suggest that there was no alternative source of information about the environmental conditions in Ecuador or their effect on the population.

(c) Journalist Privilege
The Lago Agrio Plaintiffs argue that the Court erred in finding that the material in question is not confidential.[37] Berlinger contends that it did so "by completely disregarding Second Circuit precedent that recognizes the significant burden that will be imposed on Berlinger and his future work . . . if he is required to produce the Footage."[38] They are not likely to prevail on these contentions.
Under Gonzales, the showing required to overcome the journalist privilege depends upon whether the material in question is confidential. The burden of establishing confidentiality rests with the proponent of the privilege,[39] here Berlinger. This Court held that the burden was not sustained here. In arguing the contrary, both respondents ignore the record before the Court.
First, Berlinger's evidentiary showing with respect to assurances of confidentiality was weak, to say the least.[40] He stated:
"I entered into agreements with some of my sources, promising that I would not use certain footage in which they appeared without first obtaining their express authorization. Other times, there *307 was a standing agreement with my subjects that they could request that the camera be turned off if they became uncomfortable. With respect to this footage, there also was an implicit understanding that the moments leading up to the request to turn off the camera would not to be [sic] included in the film. I offered these or other confidentiality arrangements to representatives of the plaintiffs and Chevron.
* * *
"There was an implicit (and sometimes explicit) understanding that the materials I decided to leave out of the finished product would remain confidential and not be turned over to third parties for a purpose other than the making of the film."[41]
But this was far from sufficient to sustain his burden.
As an initial matter, Berlinger submitted no evidence that any person whose authorization he promised to obtain before using footage in which that person appeared is depicted in the Outtakes, let alone that he did not obtain such authorization. Nor did he submit any evidence that any person who is depicted in the Outtakes ever became uncomfortable or asked him to turn off his camera. Even if he had, there was no evidence, other than Berlinger's legal conclusion, that "there . . . was an implicit understanding that the moments leading up to the request to turn off the camera would not . . . be included in the film."[42] Likewise, there is no evidence that the Outtakes contain material depicting any person with whom Berlinger had an explicit agreement that materials left out of the finished product would remain confidential. And there most assuredly is nothing concrete to support the view that there was "an implicit . . . understanding" with anyone that materials left out of the film would be held in confidence.
The significance of Berlinger's own statements is plain. Everyone whom Berlinger taped understood that Berlinger was making a film for public release and that Berlinger was free to use any and all depictions of his subjects, in his uncontrolled discretion, with "some" exceptions in the cases of persons with whom he agreed first to obtain authorization. Certainly the persons who received no right of prior approval had no expectation of confidentiality. And while persons who received such a right might have had such an expectation, but for the important qualification discussed below, there is no evidence that depictions of any such persons actually appear in the Outtakes or that their authorization was not obtained. Berlinger's own statements demonstrate that this Court's finding as to confidentiality was not clearly erroneous. Berlinger's statements, moreover, do not stand alone on this point.
Berlinger submitted to persons whom he filmed a form of release that provides in pertinent part as follows:
"STANDARD RELEASE
"I hereby confirm that I willingly participated in a documentary film production about the Ecuadorian class action lawsuit against Chevron-Texaco (my `Contribution'). I understand and acknowledge that the filmmakers may use my Contribution in connection with the creation of a nonfiction production (the `Production') which may be released or licensed theatrically, non-theatrically, on television, on home video or similar viewing devices, on the Internet and/or *308 In any media now known or hereafter invented.

"For good and valuable consideration, receipt of which is hereby acknowledged, I hereby irrevocably grant to @radical.media, inc. (the "Producer') and its successors, licensees and assigns (the `Licensed Parties') . . . the unrestricted right to use any interview(s) of me as well as my name, picture, likeness, image, biography and record voice in the Production, and in advertising and publicity in connection therewith. This grant applies to all media now known or hereafter invented throughout the universe in perpetuity. I acknowledge that the Producer and/or Licensed Parties may edit or alter my Contribution to the Production as they wish, and that they are under no obligation whatsoever to use my Contribution."[43]
Given the entire record, there is little likelihood of reversal with respect to the finding that respondents failed to demonstrate that the Outtakes, or any part of them, are confidential.
Respondents cannot avoid this conclusion by suggesting, as Berlinger does, that any disclosure by a journalist of nonconfidential information would impose an undue burden and therefore run afoul of the journalist privilege.[44]Gonzales of course demonstrates that this is not the law. Disclosure of nonconfidential information may be required on a proper showing, which was made here. Moreover, the Court does not, on this record, accept the suggestion that Berlinger's activities as a film maker would be unduly burdened by requiring disclosure.
Berlinger quite clearly was free to give all of his subjects an assurance that no footage in which they appeared would be used without their consent and to do his taping without getting the blanket releases that he did. Had he done so, he would have been in a much stronger position. But he wanted and got complete freedom to use whatever he shot. That freedom is not consistent with his claim that disclosure of what he did not use in the film would impose an undue burden on his or other journalists' activities.
It is important to recognize also that this case has little or nothing in common with the archetypal situations in which journalist privilege is claimed-an attempt by a reporter to protect the identity of a confidential source who has given the reporter otherwise unavailable information of public interest.[45] In those situations, it often is entirely reasonable to conclude that protection of the identity of the source is important to ensuring that other sources later will come forward with other information of public importance, secure in the knowledge that their identities will not be revealed. Here, on the other hand, we deal not with the identities of sources who provided important information on an assurance of confidentiality. We are concerned instead with a claim of privilege with respect to depictions of persons who agreed to appear on camera and to the public use of their images and words in a film in the unlimited discretion of the film maker.
*309 This Court certainly recognizes the utility of documentary films to public awareness of significant subjects and respects those who make such films. As a factual matter, however, it is not persuaded, given the evidence that Berlinger has adduced in this case, that disclosure of these Outtakes would impair the ability of Berlinger or other film makers to practice their craft and serve the public interest.

B. The Equitable Factors
The remaining factors pertinent to the stay request may be dealt with briefly.
Respondents are not threatened with irreparable injury absent a stay of the order appealed from. The order simply authorized issuance of subpoenas. As detailed above, Berlinger now has the option of complying or disobeying them. If he disobeys them, petitioners will have the option of moving to hold him in contempt. If he is held in contempt, he will have the option to appeal and to seek a stay of the contempt order. There can be no irreparable injury at least until that point. In any case, there is no evidence that anyone who appeared in Crude is a confidential sourceso far as the record discloses, they all willingly appeared on camera. Their identities are readily discernable. Disclosure of the Outtakes by compliance with the subpoenas threatens them with no risk that they did not agree to bear when they agreed that Berlinger, in his sole discretion, could use the footage in which they appeared.[46]
Second, the petitioners are threatened with serious and, it appears, imminent adverse consequences if a stay were granted, as the context of these applications cannot be ignored. The Lago Agrio Plaintiffs are pushing the Ecuadorian court to close the evidentiary phase of that litigation and immediately enter a multibillion dollar judgment against Chevron, thus preventing Chevron from placing before that court the likely relevant evidence contained in the Outtakes. Those plaintiffs intend, if they succeed, to attempt to enforce such a judgment around the world. Moreover, on May 3, 2010, the Prosecutor General's office in Ecuador announced that it is asking the National Court of Justice to proceed with criminal fraud charges against petitioners Veiga and Perez. The parties here thus are in a racethe Lago Agrio Plaintiffs seeking to obtain judgment against Chevron and criminal prosecution of Veiga and Perez before the petitioners can obtain evidence which might prevent or help prevent these obviously threatening developments. And if this were not clear enough from the record, it would have been confirmed by the Lago Agrio Plaintiffs' position during the argument of this motion for a stay. When asked by the Court whether they would agree to a worldwide standstilla freezing of the Ecuadorian litigation and efforts to have the Ecuadorian government suspend the threatened criminal proceedings against Veiga and Pallarespending an expedited appeal, they refused.[47]
*310 The risk of imminent and perhaps irreparable harm to the petitioners if a stay were granted is palpable. The respondents' claims of undue delay by petitioners are unpersuasive in view of the changes in the political and litigation situation in Ecuador.
As for the public interest, the Court of course recognizes that the journalist privilege serves a public purpose as well as a private interest, at least where it is properly invoked. Nevertheless, this Court has held that the requirements of the journalist privilege have not been satisfied here, given the record that Berlinger placed before the Court. Moreover, public interests in justice, fair play, and full disclosure most certainly would be served by the disclosure of the evidence pertinent to the proceedings both in Ecuador and before the arbitration panel.

III
As the foregoing demonstrates, there is reason to doubt the finality of the order appealed from and hence its appealability, at least in central respects and even more broadly. Even if there were appellate jurisdiction, none of the respondents would be likely to prevail on the merits. The combination of these uncertainties makes the likelihood of success on appeal quite modest.[48] The Court therefore would deny a stay pending appeal even if respondents had made a more convincing showing that the equities favored them. In fact, however, the equities cut against them. In all the circumstances, the equitable factors on balance strongly favor the petitioners. Respondents' motions for a stay pending appeal are denied.
On the other hand, the temporal exigencies do not appear to be so pressing that the Court of Appeals should be compelled to act on respondents' inevitable emergency motion without hearing petitioners. Accordingly, on .the conditions that respondents (a) serve and file any stay motion in the Court of Appeals before 10 a.m. on May 21, 2010,[49] and (b) consent in that motion to petitioners serving and filing their opposition at or before 10 a.m. on May 24, 2010, then the time for the required compliance with the subpoenas is postponed from May 21, 2010 until 10 a.m. on May 31, 2010.
SO ORDERED.
NOTES
[1] The background of this matter is described in detail in the decisions of this District and the Second Circuit. See Jota v. Texaco, Inc., 157 F.3d 153 (2d Cir.1998); Republic of Ecuador v. ChevronTexaco Corp., 376 F.Supp.2d 334, 341 (S.D.N.Y.2005); Aguinda v. Texaco, Inc., 945 F.Supp. 625 (S.D.N.Y.1996); Aguinda v. Texaco, Inc., 142 F.Supp.2d 534 (S.D.N.Y.2001).
[2] Aguinda v. Texaco, Inc., 303 F.3d 470, 473 (2d Cir.2002).
[3] See Republic of Ecuador, 376 F.Supp.2d at 341.
[4] Id. at 341-42.
[5] Id. at 342.
[6] See, e.g., Maazel Decl. Ex. 1, Martinez Aff. ¶ 2 ("The Courts in Ecuador still represent a totally adequate forum...."); Id. Ex. 4-8 (Texaco briefs).
[7] See Aguinda, 142 F.Supp.2d 534.
[8] See Aguinda, 303 F.3d 470.
[9] Chevron merged with Texaco in 2001.
[10] Republic of Ecuador, 376 F.Supp.2d at 342.
[11] Hendricks Decl. Ex. UU, at 2.
[12] Mastro Decl. Ex. S, at 11; Ex. V (Oct. 3, 2007 Order) at 6, 10, 16.
[13] Dans Decl. Ex. 2, at 8, 10.
[14] Id. Ex. 1.
[15] Id. Ex. 9 ("Crude Realities").
[16] Berlinger Mem. at 4 (citing Berlinger Decl. ¶ 14).
[17] `Socialismo' en el discurso de Correa, EL UNIVERSO, July 23, 2007, http://www. eluniverso.com/2007/07/23/0001/8/52BB 6011269D4A87B7E96771F48D4A62.html; see also Rafael Correa Biography, GUERRILLERO, June 29, 2009, http://www.guerrillero.cu/ english/index.php?option=com_content& view=article&id=577: rafael-correabiography&catid=41: varieties&Itemid=61.
[18] Ecuador Candidate Correa to Redraw Private Oil Contracts, MarketWatch, Oct. 13, 2006, http://www.marketwatch.com/story/ story/rescue?SourceUrl=http:% 2F% 2Fwww.marketwatch.com% 2Fstory% 2Fstory% 2Fseoindex?seoheadline=% 26dist=newsfinder% 26siteid=google; Rafael Correa Biography, supra note 17.
[19] Ecuador Candidate Correa to Redraw Private Oil Contracts, supra note 18; Rafael Correa Biography, supra note 17.
[20] Dans Decl. Ex. 5.
[21] Id. Ex. 7.
[22] Enrico Tortolano, Revolution on March as Correa Makes History, TRIBUNE MAGAZINE, Apr. 30, 2009, http://www.tribunemagazine.co.uk/ 2009/04/30/ revolution-on-march-as-correamakes-history/.
[23] Mastro Decl. Ex. S.
[24] Id. ¶¶ 55-65.
[25] Id. ¶¶ 76(1), 76(3).
[26] Mastro Decl. Ex. AA (Crude Press Package) at 9-11. Berlinger received over twenty international awards from film, environmental, and human rights organizations for Crude, which was named one of the Top Five Documentaries of the Year by the National Board of Review and Best International Green Film at Berlin's Cinema for Peace. See Berlinger Decl. ¶ 18.
[27] Mastro Decl. Ex. G, at 1.
[28] Berlinger Decl. ¶ 33.
[29] Mastro Decl. Ex. G, at 2.
[30] Id. Ex. G, at 3.
[31] Id. Ex. G, at 4.
[32] Chevron Mem. at 3.
[33] Id.
[34] 28 U.S.C. § 1782.
[35] Schmitz v. Bernstein, Liebhard & Lifshitz, LLP, 376 F.3d 79, 83 (2d Cir.2004) (quoting In re Esses, 101 F.3d 873, 875 (2d Cir.1996) (per curiam)).
[36] Intel Corp. v. Advanced Micro Devices, Inc., 542 U.S. 241, 264, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004); In re Application of Microsoft Corp., 428 F.Supp.2d 188, 192 (S.D.N.Y.2006).
[37] Schmitz, 376 F.3d at 83-84.
[38] Intel, 542 U.S. at 264-65, 124 S.Ct. 2466; Microsoft Corp., 428 F.Supp.2d at 192-93.
[39] Schmitz, 376 F.3d at 84 (quoting In re Metallgesellschaft AG, 121 F.3d 77, 79 (2d Cir.1997)).
[40] 165 F.3d 184, 191 (2d Cir.1999).
[41] Id.
[42] Mastro Decl. Ex. S.
[43] 542 U.S. 241, 124 S.Ct. 2466, 159 L.Ed.2d 355 (2004).
[44] Id. at 258, 124 S.Ct. 2466 (quoting Hans Smit, International Litigation under the United States Code, 65 COLUM. L.REV. 1015, 1026-27 (1965)) (emphasis added).
[45] See, e.g., Ukrnafta v. Carpatsky Petroleum Corp., No. 3:09 MC 265(JBA), 2009 WL 2877156, at *4 (D. Conn. Aug. 27, 2009); In re Oxus Gold PLC, No. MISC 06-82-GEB, 2007 WL 1037387, at *5 (D.N.J. Apr. 2, 2007) (holding that a bilateral investment treaty governed by UNCITRAL rules constituted a foreign tribunal under § 1782); see also Comision Ejecutiva Hidroelectrica del Rio Lempa v. Nejapa Power Co., LLC, No. 08-135-GMS, 2008 WL 4809035, at *1 (D.Del. Oct. 14, 2008) ("[T]he Supreme Court's decision in Intel (and post-Intel decisions from other district courts) indicate that Section 1782 does indeed apply to private foreign arbitrations.").
[46] Chevron Mem. at 18.
[47] Intel, 542 U.S. at 264, 124 S.Ct. 2466.
[48] Id.
[49] Maazel Decl. Ex. 13; Pl. Mem. at 15.
[50] Respondents neither contend that granting the applications would undermine the Arbitration nor suggest that the arbitral tribunal would oppose the discovery sought here.
[51] See Intel Corp., 542 U.S. at 265, 124 S.Ct. 2466 (holding that § 1782 application could be granted though the "European Commission has stated in amicus curiae briefs to this Court that it does not need or want the District Court's assistance").
[52] See, e.g., Mastro Decl. Ex. O-Q (court orders granting Chevron § 1782 applications).
[53] No. M-19-70, 2009 WL 3754191 (S.D.N.Y. Nov. 9, 2009).
[54] Id. at *1.
[55] 28 U.S.C. § 1782.
[56] Gonzales v. Nat'l Broadcasting Co., 194 F.3d 29, 32 (2d Cir.1999); see also von Bulow v. von Bulow, 811 F.2d 136, 142 (2d Cir. 1987).
[57] Gonzales, 194 F.3d at 35.
[58] Chevron Reply Mem. at 10.
[59] von Bulow, 811 F.2d at 142; see Gonzales, 194 F.3d at 35 (holding that journalists' privilege attached to NBC Dateline footage).
[60] Gonzales, 194 F.3d at 36. Under In re Petroleum Products Antitrust Litigation, 680 F.2d 5, 7 (2d Cir.1982), where the litigant seeks confidential material, the litigant must make a "clear and specific showing [that] the information is highly material and relevant, necessary or critical to the maintenance of the claim, and not obtainable from other available sources."
[61] See von Bulow, 811 F.2d at 145-46.
[62] Berlinger Aff. ¶¶ 19, 21 (emphasis added).
[63] Berlinger Mem. at 15.
[64] Id.
[65] See Hendricks Decl. Ex. PP (Standard Release) ("I understand and acknowledge that the filmmakers may use my Contribution in connection with the creation of a nonfiction production, which may be released theatrically, non-theatrically, [or] on television.... I acknowledge that the Producer and/or Licensed Parties may edit or alter my Contribution to the Production as they wish.").
[66] See von Bulow, 811 F.2d at 145-46.
[67] Supra n. 65.
[68] See, e.g., Gonzales, 194 F.3d at 33 ("United States v. Cutler, 6 F.3d 67 (2d Cir.1993), ... did not involve confidential materials, as the attorney's pronouncements were made publicly in front of television cameras."); see also Saperstein v. Palestinian Auth., No. 09-mc-00619 (SLT)(ALC), 2010 WL 1371384, at *2 (E.D.N.Y. Apr. 6, 2010) (holding that outtakes of a BBC documentary were nonconfidential).

The cases upon which respondents rely are unavailing because they predate Gonzales, in which the Second Circuit articulated separate standards applicable to confidential and nonconfidential material. See In re Application to Quash Subpoena to NBC, Inc., 79 F.3d 346 (2d Cir.1996); United States v. Karen Bags, Inc., 600 F.Supp. 667 (S.D.N.Y.1985).
[69] Respondents of course has a full opportunity to submit affidavits, declarations and other evidence in an effort to sustain their burden. Any legitimate confidentiality interests with respect to such submissions could have been addressed by applying for leave to file such materials under seal as litigants routinely do in this Court in a myriad of circumstances. No such application was made.
[70] Gonzales v. Nat'l Broadcasting Co., 194 F.3d 29 (2d Cir.1999).
[71] Chevron Mem. at 8.
[72] Mastro Decl. Ex. G.
[73] Chevron Mem. at 11.
[74] Id. at 11 (citing Mastro Decl. Ex. G, at 3).
[75] Berlinger Mem. at 19 (citing Mastro Decl. Ex. U, at 1.).
[76] Id. at 16.
[77] Apr. 30, 2009 Hr'g Tr. 22:21-23:3.
[78] In addition, the presence of Berlinger and his crew would destroy any privilege attached to conversations among plaintiffs' counsel. Chevron may be entitled to discovery concerning the content of otherwise privileged discussions conducted in the presence of Berlinger's crew.
[79] Mastro Ex. AA (Crude press package).
[80] See Hendricks Decl. ¶¶ 2-5.
[81] Berlinger Decl. ¶ 33.
[82] See Gonzales, 194 F.3d at 36.
[83] Respondents' claim that petitioners must identify "particular scene[s]" in fact would require them to review the entirety of Berlinger's raw footage, an approach respondents assuredly would not entertain. See Tr., Apr. 30, 2009 at 23:6-8.
[84] Pallares/Veiga Mem. at 16.
[85] Berlinger Mem. at 23-24 n. 9.
[86] Id. at 21.
[87] Gonzales, 194 F.3d at 36.
[88] Berlinger Mem. at 22; Berlinger Decl. ¶ 34.
[89] 194 F.3d 29 (2d Cir.1999).
[90] Id. at 36. See also Schiller v. City of New York, 245 F.R.D. 112, 120 (S.D.N.Y.2007).
[91] Dans Reply Decl. Ex. 11.
[92] See Maazel Decl. Ex. 7-8 (Aguinda briefs).
[93] U.S. Dept. of State, Bureau of Democracy, Human Rights and Labor, 2009 Human Rights Report: Ecuador (available at http:// www.state.gov/g/drl/rls/hrrpt/2009/wha/ 136111.htm) (last visited May 6, 2010).
[94] Id.
[95] Louis D. BRANDEIS, OTHER PEOPLE'S MONEY 62 (1933).
[1] In re Application of Chevron Corp., No. 19-111, 709 F.Supp.2d 283, 2010 WL 1801526 (S.D.N.Y. May 6, 2010, corrected May 10, 2010) ("Chevron I").
[2] In re World Trade Ctr. Disaster Site Litig., 503 F.3d 167, 169 (2d Cir.2007) (quoting Hilton v. Braunskill, 481 U.S. 770, 776, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987)).
[3] Mohammed v. Reno, 309 F.3d 95, 101 (2d Cir.2002) (quoting Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc., 559 F.2d 841, 843 (D.C.Cir.1977)) (internal quotation marks omitted).
[4] E.g., United States v. Stein, 452 F.Supp.2d 281, 285-86 (S.D.N.Y.2006); see In re Parmalat Sec. Litig., No. 04 MD 1653(LAK), 2007 WL 2197057, at *1 (S.D.N.Y. July 24, 2007).
[5] United States v. Constr. Prods. Res., Inc., 73 F.3d 464, 468-69 (2d Cir.1996).
[6] Dynegy Midstream Servs. v. Trammochem, 451 F.3d 89, 92 (2d Cir.2006).
[7] Nat'l Eng'g, 13 F.3d at 95.
[8] Constr. Prods. Res., Inc., 73 F.3d at 469.
[9] 385 F.2d 1017 (2d Cir.1967).
[10] Id. at 1018 (drawing analogy to the "appealability of an order in aid of foreign letters rogatory"); see also In re Application of Silvia Gianoli Aldunate, 3 F.3d 54, 56-57 (2d Cir. 1993) (holding that "denial of motion to vacate discovery order and to quash subpoena issued pursuant to 28 U.S.C. § 1782 constitutes final, appealable decision") (citing In re Matter of Letters Rogatory, 385 F.2d at 1018).
[11] 490 F.3d 99 (2d Cir.2007).
[12] Id. at 108.
[13] The statute actually does not mention subpoenas, speaking instead of orders to make disclosure. Neither Berlinger nor the Lago Agrio Plaintiffs resisted petitioners' application on that ground. Nor are any substantial rights affected by the fact that petitioners sought and obtained subpoenas. In substance, the opposition by Berlinger and the Lago Agrio Plaintiffs to the issuance of the subpoenas was indistinguishable from resistance to the issuance of an order to produce the same information. The subpoenas are equivalent to orders to produce.
[14] See Stolt-Nielsen SA. v. Celanese AG, 430 F.3d 567, 575 (2d Cir.2005).
[15] FED.R.CIV.P. 37(b)(2)(A)(vii).
[16] 430 F.3d 567 (2d Cir.2005).
[17] Id. at 575.
[18] See id.
[19] Belle Harbor, 490 F.3d at 105.
[20] Id.
[21] Id. at 106 (emphasis in original).
[22] If the Court of Appeals lacks jurisdiction over Berlinger's appeal, it necessarily lacks jurisdiction over the appeal of the Lago Agrio Plaintiffs for the same reasons. In addition, it perhaps is arguable whether the Lago Agrio Plaintiffs are "aggrieved" by the order in question, as they must be in order to have standing to appeal from it. See, e.g., Concerned Citizens of Cohocton Valley, Inc. v. New York State Dep't of Envtl. Conservation, 127 F.3d 201, 204 (2d Cir.1997) ("standing to appeal is conferred only on parties `aggrieved' by the judgment"). But there is no need to resolve that issue, as the motions are decided on other grounds.
[23] In re Euromepa, S.A., 154 F.3d 24, 27 (2d Cir.1998).
[24] E.g., id.
[25] Berlinger Br. 6 (emphasis in original). See also Lago Agrio Br. 3 (arguing that Court erred in concluding that petitioners "over-came the journalists' privilege by proving the relevance of any non-confidential materials sought from Berlinger").
[26] 194 F.3d 29 (2d Cir.1999).
[27] Id. at 36 (emphasis added).
[28] Chevron I, 709 F.Supp.2d at 295-98, at * 10-11 (footnotes omitted).
[29] Id. at 297-98, at *11.
[30] Id.
[31] For example, a plaintiff obliged to plead fraud with particularity under FED.R.CIV.P. 9(b) is subjected to a more lenient standard where the facts are exclusively within the control of the defendant. See, e.g., Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 664 (2d Cir.1997); SEC v. Espuelas, No. 06 Civ. 2435(RJH), 2010 WL 1189639 (S.D.N.Y. Mar. 29, 2010); In re BISYS Sec. Litig., 397 F.Supp.2d 430, 438 (S.D.N.Y. 2005).

The same principle applies where knowledge of the content of subpoenaed documents or other material lies exclusively with the person from whom discovery is sought. See 7 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 34.11[4] ("It is clear that the intent of the Rules as they have evolved is to give a party a great deal of leeway in framing a [document] request, and to prevent the party from whom documents are requested from using the particularity requirement as a vehicle to avoid discovery when the party knows full well what is being requested."); see also 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2211 ("Particularity of designation . . . turn[s] on the degree of knowledge that a movant in a particular case has about the documents it requests.").
[32] Berlinger Br. 9.
[33] Chevron I, 709 F.Supp.2d at 297-98, at *11.
[34] Id.
[35] Id.
[36] Id. at 298-99, at *12.
[37] Lago Agrio Br. 3.

Berlinger purports to reserve the issue for appeal, but does not contend on this motion that he is likely to prevail on it. Berlinger Br. 6 n. 4.
[38] Id. 10.
[39] Gonzales, 194 F.3d at 36; see von Bulow v. von Bulow, 811 F.2d 136, 145-46 (2d Cir. 1987).
[40] Nor did Berlinger submit any particularized claims that any specific portions of the Outtakes were confidential notwithstanding the well known requirement that he do so. E.g., FED.R.CIV.P. 26(b)(5)(A); S.D.N.Y. Civ. R. 26.2. The failure to do so generally constitutes a waiver of any claim of privilege. See generally, e.g., OneBeacon Ins. Co. v. Forman Int'l, Inc., No. 04 Civ. 2271(RWS), 2006 WL 3771010, at *7-8 (S.D.N.Y. Dec. 15, 2006) (collecting cases).
[41] Berlinger Decl. ¶¶ 19, 21.
[42] Berlinger of course has no personal knowledge of what his subjects "implicitly" understood.
[43] Veiga Decl. Ex. A (emphasis added). Berlinger indeed concedes that he retained "complete editorial control" over his documentary, Berlinger Decl. ¶ 33, a concession inconsistent with any claim that he was free to use certain of the materials only with the consent of others.
[44] Berlinger Br. 10-12.
[45] This is not to say, of course, that the journalist privilege is limited to such cases. Rather, it is a recognition, consistent with Gonzales, that the interests at issue on claims of journalist privilege vary depending upon the circumstances.
[46] The Lago Agrio Plaintiffs' claim of threatened irreparable injury is even more tenuous. Even if the risk of mootness, standing alone, technically constitutes a threat of irreparable injury, the seriousness of that threat "is inextricably related to the appellants' likelihood of success on the merits." In re DBSD N. Am., Inc., Nos. 09 Civ. 10156(LAK), 09 Civ. 10372(LAK), 09 Civ. 10373(LAK), 2010 WL 1838630, at *1 (S.D.N.Y.2010). The Lago Agrio Plaintiffs therefore have shown little threat of irreparable injury in light of the debatable appealability of the order appealed from and the improbability of success on the merits, even assuming appealability.
[47] Such a standstill also might include the arbitration brought by Chevron.

Petitions by The Republic of Ecuador and the Lago Agrio Plaintiffs to stay that arbitration have been dismissed. Republic of Ecuador v. Chevron Corp., Nos. 09 Civ. 9958(LBS), 10 Civ. 316(LBS), 2010 WL 1028349 (S.D.N.Y.2010). The dismissal has been appealed.
[48] "Under established principles of probability theory, the probability that both of two independent events will occur is the product of the probability of each. Put differently, if P(A) is the probability of the occurrence of event A and P(B) is the probability of the occurrence of event B, and if the occurrence of A is independent of the occurrence of event B, then the probability of the occurrence of both event A and event B is the product of the probabilities of the occurrence of each, or P(A & B) = P(A)P(B). TARO YAMANE, STATISTICS: AN INTRODUCTORY ANALYSIS § 5.7, at 107-10 (2d ed.1967). Thus, if it is barely more probable than not (e.g., 51 percent likely) that [Event A, here the establishment of appellate jurisdiction, will occur] and barely more probable than not that [Event B, here the respondents prevailing on the merits, will occur], the probability of [success on appeal] is 26.01 percent." United States v. Lavan, 10 F.Supp.2d 377, 389 (S.D.N.Y.1998) (relied upon in United States v. Heath, 455 F.3d 52, 59-60 (2d Cir.2006)).
[49] Respondents have been aware for a week of the possible need to act in that time frame. Tr., May 14, 2010, at 2:14-3:9.